Points decided.

(April 29, 1901.)

# STATE v. ALCORN.

[64 Pac. 1014.]

CORPUS DELICTI—EVIDENCE.—The *corpus delicti* may be proven by declarations and circumstances, but the order in which the evidence proving the different material facts is introduced is not material.

ABORTION.—In a prosecution upon the charge of murder, where the death of deceased is alleged to result from an operation performed for the purpose of bringing about an abortion, the pregnancy of deceased must be proven beyond reasonable doubt, but need not be demonstrated to an absolute certainty.

MURDER IN THE SECOND DEGREE—MANSLAUGHTER.—Where an unnatural abortion is sought to be caused by the use of instruments and drugs, or either, and death results, an abortion not being necessary to save the life of the woman, such acts, under the statutes of Idaho, constitutes the crime of murder in the second degree, and an instruction that such acts constitute the crime of murder in the second degree, or manslaughter, is erroneous.

PREJUDICIAL ERROR.—An erroneous instruction, which is beneficial to, and not prejudicial of, the rights of the accused, is not ground of reversal in a case in which the rights of the accused have been carefully guarded and substantial justice done.

REVERSIBLE ERROR.—Under an indictment charging murder, a verdict of guilty of manslaughter is authorized under section 7926 of the Revised Statutes of Idaho.

MOTION IN ARREST OF JUDGMENT—DEMURRER.—An indictment that charged an assault was committed June 21st, and that deceased continuously languished therefrom until June 23, 1899, and then died from the result of injuries received during the assault; no demurrer was interposed to the indictment; a motion in arrest of judgment was made after the verdict, upon the ground that the indictment did not charge that death ensued within a year and a day after the assault, which motion was denied—*Held*, upon appeal, that the motion was properly denied, such question not having been raised by demurrer, and no showing being made that the accused was misled to his prejudice.

DECLARATIONS—RES GESTAE.—In case of homicide resulting from an operation performed by the accused upon the body of the deceased to bring about an abortion, the declaration of the deceased made at the time she was introduced to the accused, to the effect that she was pregnant, and which had direct reference to the contemplated transaction between deceased and the accused, is admissible in evidence as a part of the *res gestae.*

ABORTION, WHEN COMMITTED.—Under the statutes of Idaho, the crime of abortion may be committed prior to the quickening of the foetus, but the rule is otherwise at the common law

(Syllabus by the court.)

'APPEAL from District Court, Kootenai County.

Edwin McBee, for Appellant.

"Q. State, now, if you saw her in the drug store, when you saw her there, in whose company and all the other circumstances and facts as far as you know of her visit there at the drug store." Until the *corpus delicti* is established, the testimony sought to be elicited by the above question under consideration was improper. (*United States v. Searcy,* 26 Fed. 435; *Taylor v. State,* 101 Ind. 63; Wharton on Criminal Evidence, 633; *People v. Hall,* 48 Mich. 482, 42 Am. Rep. 477, 12 N. W. 665; *People v. Millard,* 53 Mich. 63, 18 N. W. 564; *People v. Aiken,* 66 Mich. 460, 11 Am. St. Rep. 512, 33 N. W. 821; 7 Am. & Eng. Ency. of Law, 863.) The court erred in overruling defendant's motion in arrest of judgment. This motion is made on the grounds that the indictment does not specify the year in which the alleged assault was made, and consequently it does not appear from the indictment that the deceased died within a year and a day from the infliction on her of the injuries described therein. We think it will be conceded that the indictment is bad. Had a demurrer been interposed on the grounds that no public offense is stated in the indictment, it certainly would have been allowed. (Rev. Stats. 7745.) No demurrer was interposed, but this motion was made under the provisions of chapter 7 of title 7 of the Penal Code. (Rev. Stats. 6567; *People v. Wallace,* 9 Cal. 31; *People v. Cox,* 9 Cal. 33.) An omission to state the year renders an indictment bad. (10 Am. & Eng. Ency. of Law, 513, note; Am. & Eng. Ency. of Pl. & Pr. 512, note; *Commonwealth v. Hutton* (Mass.), 5 Gray, 89, 66 Am. Dec. 352; *Commonwealth v. Griffin,* 3 Cush. 524; 4 Blackstone's Commentaries 375.) The court erred in giving instruction No. 3, as requested by the state. By this instruction the court informed the jury that the offense as set forth in the indictment constituted the crime of murder

in the second degree or manslaughter. (Rev. Stats. 6565.) In·
this case the defendant took the position that he should either
be convicted of murder or else acquitted. The indictment did
not charge manslaughter and the evidence showed that the de-
fendant was guilty of murder if guilty of any homicide, and a
verdict for manslaughter could only be reached through a com-
promise. Jurors would reluctantly consent to a verdict for
manslaughter who might never agree to a conviction for
murder. Such instruction is reversible error. *(State v. Pun-
shon,* 124 Mo. 448, 27 S. W. 1111; *Virgil v. State,* 63 Miss.
317; *Dyal v. State,* 97 Ga. 428, 25 S. E. 319; 4 Shars-
wood's Blackstone, 201, note.) The rule requiring the jury
to be satisfied of the defendant's guilt beyond a reasonable
doubt in order to warrant a conviction does not require that
the jury should be satisfied beyond a reasonable doubt of each
link in the chain of circumstances relied upon to establish the
defendant's guilt; it is sufficient if taking the testimony al-
together the jury are satisfied beyond a reasonable doubt that
the defendant is guilty. This instruction is taken bodily from
Sackett's Instructions to Juries, section 34, page 647. It has
been passed upon and condemned by the following authorities:
*People v. Aiken,* 66 Mich. 460, 11 Am. St. Rep. 512, 33 N.
W. 821; *State v. Gleim,* 17 Mont. 17, 52 Am. St. Rep 655,
41 Pac. 998, 31 L. R. A. 294; *Graves v. People,* 18 Colo. 185, 32
Pac. 63; *Marion v. State,* 16 Neb. 349, 20 N. W. 289; *Leonard
v. Washington Ter.,* 2 Wash. Ter. 381, 7 Pac. 872; *Clare v.
People,* 9 Colo. 122, 10 Pac. 799; 2 Thompson on Trials, sec.
2514. If this instruction was erroneous, it was prejudicial to
defendant, and could not be cured by the other instructions
given. (*Holt v. Spokane etc. R. R.,* 3 Idaho, 703, 35 Pac. 39;
*State v. Webb,* 6 Idaho, 428, 55 Pac. 892.)

Frank Martin, Attorney General, for the State.

The contention of the defendant that it is necessary to prove
the *corpus delicti* before the defendant can be convicted is true,
but it is not true, as he contends, that no evidence connecting
the defendant with the offense can be introduced until both
propositions constituting the *corpus delicti,* viz., proof of the

death of the deceased, and proof that his death was criminal, are proved. It has been repeatedly held that a voluntary confession, although of itself insufficient to prove that a crime has been committed, is competent evidence of such fact, and may, with slight corroboration, establish the *corpus delicti* as well as the guilt of the person making the confession. (*Sullivan v. State,* 58 Neb. 796, 79 N. W. 721, and cases there cited; *People v. Jones,* 123 Cal. 65, 55 Pac. 698; *State v. Jacobs,* 21 R. I. 259, 43 Atl. 31; *Tidwell v. State,* 40 Tex. Cr. App. 38, 47 S. W. 466, 48 S. W. 184.) A definite charge of the commission of a public offense is laid against the defendant so plain that "he who runs may read," and the mere fact that the year was omitted could not prejudice the substantial rights of the defendant. He should have raised the objection by demurrer, and having failed to do so the objection was waived. (Idaho Rev. Stats., sec. 7960; *In re Alcorn,* ante, p. 101, 60 Pac. 561; *People v. Squires,* 99 Cal. 327, 33 Pac. 1092; *State v. Schieler,* 4 Idaho, 120, 37 Pac. 272.) Only such objections to the instructions will be entertained by the court as are well taken and show that the erroneous instruction was prejudicial to the defendant; but where, as in this case, the defendant is accused of murder and an erroneous instruction is given as to manslaughter, and the defendant is convicted of the lower offense—manslaughter—he could not have been prejudiced by the instruction. (*People v. Swift,* 5 Pac. 505, 66 Cal. 348; *People v. Gordon,* 26 Pac. 502, 88 Cal. 422.)

QUARLES, C. J.—The appellant was tried upon an indictment charging him with the murder of one Cora A. Burke, resulting from a criminal operation performed by appellant for the purpose of bringing about an abortion; was convicted by a jury of manslaughter, and adjudged to serve a term of seven years in the state penitentiary; moved for a new trial, which was denied; and appealed, both from the judgment and from the order denying him a new trial. The record is quite voluminous, but we have given to the same our careful attention, and from the record we summarize the facts, as shown by the evidence at the trial, as follows:

The deceased was twenty years old, and had been married, but her husband had been dead about five months. She had one child, a son about four years old. She lived in her own home, her father and mother living with her. She was in apparent good health up to June 21, 1899. Some time in May, 1899, Mrs. Martha Johnson, at the request of the deceased, introduced the deceased to the appellant, who had been practicing medicine for a short time in the town of Harrison, in said Kootenai county. Before being introduced to appellant, the deceased inquired of Mrs. Johnson as to the appellant, asking if he was a good doctor, and stating at the time that she was pregnant, and had been about six weeks. Mrs. Johnson in connection with one E. J. Abbey, was conducting a restaurant and boarding-house, and defendant was boarding with them. Deceased visited the appellant the two days following her introduction to the appellant. Mr. Abbey testified that while in an adjoining room to that occupied by the appellant, and while deceased was in appellant's room, he heard deceased say: "The instrument that you are using on me hurts me." On the night of Tuesday, June 21, 1899, appellant requested one J. T. Rundell to assist him, and said Rundell did assist appellant to carry a table, about five feet in length, into appellant's office, the same being the back room to a drug store in the town of Harrison. Rundell's curiosity being excited, he asked appellant if he was going to "dissect a stiff," and appellant said, "No; that he was going to perform an operation on a party across the river." About 10 o'clock, Rundell, who was, through curiosity, as he says, on the lookout, saw deceased enter the drug store and go into the office of appellant. Rundell then went to the rear. There was a small window in a door in the rear end of appellant's office, on the inside of which a blind or curtain had been drawn in such a manner that it did not hang perpendicular, leaving a small corner of the window uncovered, through which the witness Rundell looked and saw what transpired. Rundell details at length what he saw. He saw appellant standing by deceased, who was sitting in a chair, supporting the head of deceased with one hand, in which he held a small phial containing a dark liquid, and holding to the nostrils of deceased a

cloth with the other hand. Witness stated that this continued until deceased appeared to be asleep, whereupon appellant took her in his arms and laid her upon the table, which witness had previously assisted to carry into the office, laid her on her back, her lower limbs spread apart, removed her drawers, rolled up her skirts, placed a speculum in her vagina, and examined her organs, and then took a probe about a foot long and introduced it into her person through the speculum, which caused some blood to flow, which appellant removed with a cloth. Witness testified that the operation consumed about one and a half hours; that appellant used the cloth, which he supposed to be saturated with chloroform, by holding the same to the nostrils of deceased the second time while she was on the table. The feet of deceased were toward the witness. Deceased then revived, and with the assistance of appellant rearranged her clothing and went away in the direction of home. The next day, about 4 o'clock P. M., appellant was called to see deceased, who was suffering greatly, made a digital examination of her uterus, and found the same inflamed and bleeding to some extent. Appellant prescribed ergot, directing that she be given one-half of a teaspoonful each half hour three times, when it should be left off. He afterward directed that it be given in same quantity every hour until otherwise directed, and it was so given for eighteen hours. In response to a question by the mother of deceased, appellant said that the womb of the deceased was badly inflamed, whereupon her mother asked: "Doctor, what is the cause of that?" To which appellant answered: "She caught a bad cold. She does not flow enough when she has her monthlies. I will give her something to make her flow." This was Wednesday afternoon. Appellant visited deceased five times all told, the last time on Friday afternoon about two hours before she died, and while her feet and hands were cold with approaching dissolution, her fingers blue, and her lips purple. He told her mother that she was getting along all right and would soon be up, immediately after which he boarded the train and went into the state of Washington, returning about 10 o'clock the following Sunday morning. The next day (Monday) he left the state and went to Montana,

where he was arrested and brought back to Kootenai county, reaching there July 5th. Appellant returned without a requisition. During the illness of the deceased much blood and considerable clotted blood passed from her, saturating the bedding under her. Mrs. Knight, a witness for the prosecution, testified that she was at the house of the deceased during her illness and after her death, and helped to dress her remains. Using the language of the witness: "I helped dress her after she was dead. Her clothing and bedclothing were saturated with blood. A quilt was doubled up under her four thicknesses, and it was clear through the quilt. It was clots of blood. I observed an odor in connection with it. There was too great a quantity to have come from the ordinary menstruation. Much greater in quantity." About 6 o'clock P. M. on Tuesday, June 21, 1899, William Ketchum called appellant to visit his (Ketchum's) wife, and appellant then said: "Well, I don't know. I am expecting a miscarriage here any minute. I can go over there, and come back, if it does not make any difference to them." Appellant did go with said Ketchum. Deceased had been to see appellant that afternoon, and he had directed her to come to his office that night. F. H. Bradbury, sheriff of Kootenai county, testified at the trial as follows concerning an admission made by the appellant: "He told me that he never had anything to do with this girl, Cora Burke; that he began in the daytime an operation on a man for stricture, and did not complete it; and that he took him in the back room of the drug store and completed the operation in the evening. He gave me this statement after I had warned him not to make any statement to me. This was on the train between here and Missoula." The appellant testified in his own behalf, and to some extent corroborated that of the witness Rundell. His defense is that the deceased had endeavored to relieve herself by using a hair dart, which, while inserted in her uterus, pierced the wall thereof and broke off, leaving a piece of the same about one and a half inches in length in the uterus; that the operation that Rundell described consisted of his efforts to remove this piece of hair dart; that he did remove the piece of hair dart by using a speculum and piston syringe, having at-

tached to the syringe a snare. He also testified that he was introduced to deceased by Mrs. Johnson.

A number of expert witnesses were introduced, to whom two sets of hypothetical questions were propounded—the one being based upon the idea that the speculum and probe were used on deceased to procure an abortion; the other, to remove a piece of hair dart from her uterus—in reply to which questions the expert witnesses gave speculative or professional opinions as to the cause of death. The learned doctors all agreed that the deceased died of septic or blood poisoning; and the evidence also shows that ergot, when given to a pregnant woman, has the tendency to contract the uterus and throw out the foetus. It is earnestly contended by the appellant that the hypothetical opinion asked on the part of the prosecution was not based upon the evidence introduced. A careful study of the record convinces us that the action of the trial court in overruling the objection interposed by the defense to this question upon said ground was correct. Said hypothetical question was based upon facts which the evidence then before the jury tended to prove.

It is also contended by appellant that the evidence showing the facts detailed above was improperly admitted, for the reason that the *corpus delicti* had not first been established. We are somewhat in doubt as to the real meaning of counsel in making this contention. Whether he means that the state should first prove the death of the deceased and the cause thereof, or the intent of appellant in making the operation described by the witness Rundell, or both, we are at some loss to determine. Certain portions of the argument of the counsel for appellant appear to be based upon the idea that, before the conviction in question can be sustained, the prosecution must first prove beyond all question that the deceased was pregnant, or, in other words, that this fact must be demonstrated to an absolute certainty, before the prosecution could proceed to introduce evidence tending to connect the appellant with the alleged crime. At the common law an abortion could not be committed prior to the quickening of the foetus. This is not the case under our statutes. The pregnancy of the deceased in the case at bar can be shown, and was shown to the satisfaction of the jury, by

declarations and by circumstances. She declared at the time she was introduced to the appellant, from whom she was evidently seeking relief, that she was pregnant. Appellant declared on the evening that he operated upon the body of the deceased with speculum and probe that he was expecting a miscarriage at any minute. Deceased was in good health, as was testified by her mother, up to the day of this operation. She was young, had been a widow a short time (five months), and believed that she had been pregnant a little over two months, and was engaged to be married. The very use of the probe by the appellant is a corroborating circumstance. His declarations to the sheriff, purely voluntary, that he had not touched the girl, Cora Burke, and that the operation that he performed was upon a man for stricture, and his actions in leaving the state, all tend to show guilty knowledge upon his part, and were inconsistent with the idea of the innocent exercise by him of professional skill. It is true that there was a conflict in the testimony to some extent. Two theories were advanced—that by the prosecution to the effect that the operation, proven by an eye-witness and corroborated by many facts and circumstances, the unnatural flow of clotted blood from the generative organs of deceased, and the acts and declarations of appellant, tended to establish an attempt on the part of the appellant to bring about an abortion upon the person of the deceased; while the other theory was based solely upon the idea that the operation was performed for the purpose of removing a portion of a hair dart from the uterus of the deceased. We think the verdict of the jury was supported by the evidence, and that the *corpus delicti* was sufficiently proven, both as to the body of the offense and as to the intent of appellant in committing it. A reversal cannot be had because, forsooth, the elements of the crime were not proven in a certain order. Before a verdict of guilty can be sustained, the evidence must be sufficient to establish the *corpus delicti*—the body of the offense—and the intent with which it was committed beyond a reasonable doubt. The intent of the accused is to be gathered from his acts, considered in connection with, and in the light of, the surrounding conditions and circumstances. We are convinced that the evidence before the

jury was sufficient to establish the *corpus delicti* and the felonious intent with which the appellant acted.

Appellant insists that, because murder is charged in the indictment, a verdict of guilty of manslaughter cannot be sustained. This contention needs no extended consideration. Section 7926 of the Revised Statutes is conclusive of this question. (See *In re Alcorn*, ante, p. 101, 60 Pac. 561.)

It is also contended that a reversal must be had upon the ground that the trial court denied the motion in arrest of judgment made by the appellant, based upon the failure of the indictment to allege the day and year when the alleged criminal operation or attempted abortion occurred. The indictment charges as follows: "That the said R. J. Alcorn, on or about the twenty-first day of June, and before the finding of this indictment, Kootenai county, state of Idaho, in and upon one Cora A. Burke feloniously and of his malice aforethought did make an assault, and did then and there feloniously and of his malice aforethought force, thrust, and strike a certain instrument to the jurors unknown which he, the said R. J. Alcorn, then and there held in his hands, up into the womb and body of the said Cora A. Burke, and did supply and administer and procure the said Cora A. Burke to take divers medicines and drugs, who was then and there pregnant with child, with the criminal intent thereby to procure the miscarriage of the said Cora A. Burke, when the said miscarriage was not necessary to preserve the life of the said Cora A. Burke, thereby then and there inflicting on the said Cora A. Burke, in and about her womb and other internal parts, certain wounds, bruises, and lacerations, and creating in the said Cora A. Burke a mortal sickness and feebleness of body. She, the said Cora A. Burke, did then and there languish and continually languish until, on or about the twenty-third day of June, 1899, she there died. And so the said R. J. Alcorn did, in manner and form aforesaid, feloniously, unlawfully, willfully, deliberately, premediatedly, and of his malice aforethought, kill and murder the said Cora A. Burke, contrary to the form of the statutes in such case made and provided and against the peace and dignity of the state of Idaho." A reading of the indictment shows that the

date of the assault is not specifically given; yet in one sentence
the indictment alleges that the assault was made June 21st,
and that the deceased languished until June 23, 1899, and then
died. Can any reasonable inference, other than that the de-
ceased died three days after the assault, be drawn from the
language used? Be this as it may, the question should have
been raised by demurrer. It was not. There is no showing
made that appellant was misled to his prejudice by the defect
in the indictment complained of by him. Under the provisions
of sections 7686, 7960, and 8236 of the Revised Statutes, we
feel constrained to hold that the trial court properly overruled
the motion in arrest of judgment.

It is argued on behalf of the appellant that it was prejudicial
error on the part of the trial court to admit the declaration of
the deceased, made to the witness Mrs. Johnson at the time said
witness introduced deceased to the appellant, touching her condi-
tion as to pregnancy. It is contended that this is hearsay evi-
dence. It was hearsay. But hearsay evidence is sometimes ad-
missible. Declarations of the parties to a transaction and some-
times of third parties who are dead, relating to and explanatory
of the principal act being investigated, are admissible, especially
when such declaration is against the interest of the party making
it. The declaration was against the interest of the deceased.
It tended to show a state of facts inconsistent with her observ-
ance of the rules of chastity. No beneficial purpose of the de-
ceased could be served by the declaration. It tended to show
her motive in meeting the appellant. Taken in connection with
declarations of the appellant—for instance, his declaration made
to the witness Ketchum—it tends to show the nature of the rela-
tions between appellant and deceased; and while appellant ob-
jected to the evidence proving this declaration, yet, to subserve
his own ends, he testifies to alleged declarations made by the
deceased at the same time in regard to her condition. If the
declarations of deceased as to her condition are admissible, and
appellant took that ground in the trial court, it is upon the idea
that it is either a part of the *res gestae*, or else on the ground
that it was connected with the alleged offense, made, not in favor
of, but against, the interest of the declarant, who is now dead;

the fourth day of May, 1899, the governor of the state of Idaho issued the following proclamation:

"State of Idaho, Executive Office.

"Whereas, it appearing to my satisfaction that the execution of process is frustrated and defied in Shoshone county, state of Idaho, by bodies of men and others, and that combinations of armed men to resist the execution of processes and to commit deeds of violence exist in said county of Shoshone; and whereas, the civil authorities of said county of Shoshone do not appear to be able to control such bodies of men, or prevent the destruction of property and other acts of violence; and whereas, on Saturday, the twenty-ninth day of April, 1899, at or near the town of Wardner Junction, in said county of Shoshone, state of Idaho, an armed mob did then and there wantonly destroy property of great value, with attendant loss of life; and whereas, said destruction of property, with attendant loss of life, by mob violence, as above set forth, is but one and a repetition of a series of similar outrages covering a period of six years or more just passed, the perpetrators of said outrages seeming to enjoy immunity from arrest and punishment through subserviency of peace officers of said county of Shoshone, or through fear on the part of said officers to such bodies of lawless and armed men; and whereas, I have reason to believe that similar outrages may occur at any time, and believing the civil authorities of said county of Shoshone are entirely unable to preserve order and protect property: Now, therefore, I, Frank Steunenberg, governor of the state of Idaho, by virtue of authority in me vested, do hereby proclaim and declare the said county of Shoshone, in the state of Idaho, to be in a state of insurrection and rebellion. In testimony whereof, I have hereunto set my hand and caused to be affixed the great seal of the state. Done at the city of Boise, the capital of the state of Idaho, this fourth day of May, A. D. 1899, and of the independence of the United States of America, the one hundred and twenty-third.

"FRANK STEUNENBERG.

"By the Governor.

"M. PATRIE,
"Secretary of State."

and doings of anyone absorbed in the event, whether participant or bystander. They may comprise things left undone, as well as things done. Their sole distinguishing feature is that they must be the automatic and necessary incidents of the litigated act—necessary in this sense; that they are part of the immediate preparations for or emanations of such act, and are not produced by the calculated policy of the actor. They are the act talking for itself; not what the people say when talking about the act. In other words, they must stand in immediate causal relation to the act, a relation not broken by the interposition of voluntary individual wariness, seeking to manufacture evidence for itself. Incidents that are thus immediately and unconsciously associated with an act, whether such incidents are doings or declarations, become in this way evidence of the character of the act. They are admissible, though hearsay, because in such cases, from the nature of things, it is the act that creates the hearsay, not the hearsay the act. It is the power of perception unmodified by recollection that is appealed to, and not of recollection modifying perception. Whenever recollection comes in, whenever there is opportunity for reflection and explanations, then statements cease to be part of the *res gestae.* Aside from the temptations to the parties, when they have time to collect themselves, to palliate or aggravate, there is a tendency to exaggeration, apt to swerve the memory of those who were witnesses of any casualty or collision when they talk about it after it is over. Hence it is important for the interests of truth and justice that the statements of neither parties nor bystanders, made after the event, should be received on trial, unless under the responsibility of an oath and with opportunity of cross-examination." We conclude that the declaration of deceased, testified to by Mrs. Johnson, was properly admitted. The trial court in its instructions told the jury that the declaration of deceased testified to by Mrs. Johnson must be received by them with great caution, and was not sufficient of itself to establish the fact that deceased was pregnant, but that such declaration would not justify the conclusion that she was pregnant, unless supported by corroborative testimony or circumstances such as would satisfy them beyond a reasonable doubt that deceased was pregnant.

It is seriously contended that the trial court committed a reversible error in giving instruction No. 3, to the effect that procuring or attempting to procure the abortion of a pregnant woman, when such abortion is not necessary to save the woman's life, by use of drugs, instruments or other means, is murder in the second degree or manslaughter, when death results. This instruction is erroneous, as the crime in such case is murder in the second degree under our statutes. Yet the error was beneficial, not prejudicial, to the accused; hence, is not reversible. Section 7926 of the Revised Statutes is as follows: "The jury may find the defendant guilty of any offense, the commission of which is necessarily included in that with which he is charged in the indictment, or of an attempt to commit the offense." A judgment of conviction will not be reversed upon the ground that an erroneous instruction has been given, where such instruction does not prejudice a substantial right of the defendant.

The trial court instructed the jury that: "The law requiring the jury to be satisfied of the defendant's guilt beyond a reasonable doubt in order to warrant a conviction does not require that you should be satisfied beyond a reasonable doubt of each link of the chain of circumstances relied upon to establish the defendant's guilt. It is sufficient if, taking all the testimony together, you are satisfied beyond a reasonable doubt that the defendant is guilty." In *State v. Kruger,* ante, p. 178, 61 Pac. 463, we refused to reverse a judgment of conviction upon the ground that the trial court gave a similar instruction. In the syllabus to that case, prepared by the court, it is said: "In the trial of a criminal case, where the evidence depended upon for a conviction is circumstantial, every fact necessary to connect the defendant with the commission of the alleged crime must be established to the satisfaction of the jury beyond a reasonable doubt; but this does not impose upon the prosecution the burden of proving every collateral or corroborative fact or circumstance in the case beyond a reasonable doubt." The instruction under consideration, while from an eminent authority (Sackett on Instructions to Juries), is in bad form and should not be given, for the reason that, unexplained by other instructions, it might mislead the jury. A careful study of the instructions given in this

case convinces us that the law was fairly given to the jury, that the rights of the defendant were carefully guarded, the instructions being more favorable to him in many respects than he had a right to ask, and that, taking the instructions as a whole, the one at present under consideration did not prejudice the rights of the defendant or mislead the jury.

What we have already said disposes of the principal questions raised on behalf of appellant. Numerous other questions are argued in the exhaustive and able brief of counsel for appellant, yet in our view those not specifically mentioned here are merely collateral to those discussed, and necessarily follow those which we have considered. The principal conflict, whether it be of fact or theory, is based upon the testimony of the appellant touching the object or intent with which he made the operation detailed by the witness Rundell. He admitted that he made the operation—admitted the use of the speculum. He claimed, however, that he was removing a piece of hair dart which had pierced and lodged in the wall of the uterus of the deceased. The theory of the prosecution based upon the facts and circumstances proven, was the natural and reasonable one, and was adopted by the jury. The theory of the defense rested solely upon the evidence of the defendant as to the presence of the hair dart in the uterus of the deceased. The manner of its removal, as claimed by the appellant, was doubtless regarded by the jury as improbable. The appellant had been impeached by proving contradictory statements. His declaration, voluntarily made after his arrest, to the effect that he had not "touched" the deceased, and that the operation that he performed was on a man for stricture; his declaration to Ketchum, the evening that he performed the operation and four hours prior thereto, to the effect that he was expecting a miscarriage at any moment; his leaving the state so soon after the death of deceased—all had the tendency to destroy the theory of the defense in the minds of the jury, and under these conditions we do not feel justified in overturning the verdict of the jury. The crime for which appellant has been convicted is one of the worst known to the law. An unnatural abortion, brought about by means of drugs or instruments, violates decency, the best interests of society, the di-

vine law, the law of nature, the criminal statutes of this state, and is not only destructive of life unborn, but places in jeopardy the life of a human being—the pregnant woman. Both actors, when there are two, as in the case at bar, are guilty of felony, and ought to be punished by the law, if the woman survives; and, if she does not, then the person or persons participating in the abortion should be punished. This crime is one of grave consequences to society. The law prohibits it and prescribes severe penalties. The law ought to be strictly enforced. In a case of this kind, this court will not notice purely technical errors, which do not prejudice the substantial rights of the accused, for the purpose of reversing the verdict returned by the jury, especially, as in this case, where we are satisfied that substantial justice has been done. For the foregoing reasons the judgment and the order denying a new trial are affirmed.

Sullivan and Stockslager, JJ., concur.