**Janice ABELE et al., Plaintiffs,**

**v.**

**Arnold MARKLE, State's Attorney for New Haven County, et al., Defendants.**

Civ. No. 14291.

United States District Court,
D. Connecticut.

April 18, 1972.

Marilyn P. A. Seichter, Hartford, Conn., Catherine G. Roraback, Ann C. Hill, Co-counsel, New Haven, Conn., Kathryn Emmett, Bridgeport, Conn., Marjorie Gelb, West Hartford, Conn., Barbara Milstein, New Haven, Conn., Nancy Stearns, New York City, for plaintiffs.

Daniel Schaefer, Asst. Atty. Gen., George D. Stoughton, Chief Asst. State's Atty., Hartford, Conn., for defendants.

Peter Tyrrell, Waterbury, Conn., and Joseph P. Nucera, Bridgeport, Conn., amicus curiae, for defendants.

Before LUMBARD, Circuit Judge, and NEWMAN and CLARIE, District Judges.

LUMBARD, Circuit Judge.

In Connecticut, statutes prohibit all abortions,[1] all attempts at abortion,[2] and all aid, advice and encouragement to bring about abortion,[3] unless necessary to preserve the life of the mother or the fetus. These statutes are challenged by Dorothy Doe, pregnant, married, and a Connecticut resident, and by numerous female physicians, nurses, and medical counseling personnel residing and practicing in Connecticut.[4] We think that by these statutes Connecticut trespasses unjustifiably on the personal privacy and liberty of its female citizenry.[4a] Accordingly we hold the statutes unconstitutional in violation of the Ninth Amendment and the Due Process Clause of the Fourteenth Amendment.[5]

The decision to carry and bear a child has extraordinary ramifications for a woman. Pregnancy entails profound physical changes. Childbirth presents some danger to life and health.[6] Bear-

1. Conn.Gen.Stat. 53–30 provides:

   § 53–30. Abortion or miscarriage

   Any woman who does or suffers anything to be done, with intent thereby to produce upon herself miscarriage or abortion, unless necessary to preserve her life or that of her unborn child, shall be fined not more than five hundred dollars or imprisoned not more than two years or both.

2. Conn.Gen.Stat. 53–29 provides:

   § 53–29. Attempt to procure miscarriage

   Any person who gives or administers to any woman, or advises or causes her to take or use anything, or uses any means, with intent to procure upon her a miscarriage or abortion, unless the same is necessary to preserve her life or that of her unborn child, shall be fined not more than one thousand dollars or imprisoned in the State Prison not more than five years or both.

3. Conn.Gen.Stat. 53–31 provides:

   § 53–31. Encouraging the commission of abortion

   Any person who, by publication, lecture or otherwise or by advertisement or by the sale or circulation of any publication, encourages or prompts to the commission of the offenses described in section 53–29 or 53–30, or who sells or advertises medicines or instruments or other devices for the commission of any of said offenses except to a licensed physician or to a hospital approved by the state department of health, or who advertises any so-called monthly regulator for women, shall be fined not more than five hundred dollars or imprisoned not more than one year or both.

4. The original plaintiffs in this suit were the present plaintiffs and other women of child-bearing age. The district judge dismissed their complaint and refused to convene a three-judge court on the ground that the plaintiffs lacked sufficient standing to present a justiciable case within the meaning of Article III, § 2 of the United States Constitution. On appeal, this court held that pregnant women and medical personnel desiring to give advice and aid regarding abortions had standing to challenge the Connecticut statutes. Abele v. Markle, 452 F.2d 1121 (2 Cir. 1971). Leave was granted for any plaintiff to file an amended complaint alleging pregnancy. The three-judge court was then convened. Peggy Poe filed an amended complaint alleging that she was pregnant and seeking interlocutory relief against the enforcement of the statute. On February 18, 1972, a hearing was held and interlocutory relief denied solely on the ground that plaintiffs had failed to show irreparable injury warranting such relief. Peggy Poe subsequently had an abortion in New York, thus mooting her case. Dorothy Doe thereupon filed affidavits alleging her pregnancy and desire to receive an abortion in Connecticut. Since then the parties have filed briefs stating their positions.

4a. Plaintiffs have argued that the statutes are unconstitutionally vague. Though the statutes sweep broadly to their desired end of prohibiting abortions, they define with sufficient particularity the prohibited conduct. Accordingly we reject plaintiffs' vagueness argument. United States v. Vuitch, 402 U.S. 62, 91 S.Ct. 1294, 28 L.Ed.2d 601 (1971).

5. The three statutes must be considered together as they are all part of the statutory scheme. It would be a futile exercise to recognize the right of the mother to an abortion, and then deny her the means to vindicate that right by prohibiting her competent professional advice and treatment.

6. Substantially greater than abortion in the first three months of pregnancy. YWCA v. Kugler, 342 F.Supp. 1048, 1972; People v. Belous, 71 Cal.2d 954, 80 Cal.Rptr. 354, 360–362, 458 P.2d 194, 200–201 (1969), cert. denied 397 U.S. 915, 90 S.Ct. 920, 25 L.Ed.2d 96 (1970);

ing and raising a child demands difficult psychological and social adjustments. The working or student mother frequently must curtail or end her employment or educational opportunities. The mother with an unwanted child may find that it overtaxes her and her family's financial or emotional resources. The unmarried mother will suffer the stigma of having an illegitimate child. Thus, determining whether or not to bear a child is of fundamental importance to a woman.

The Connecticut anti-abortion laws take from women the power to determine whether or not to have a child once conception has occurred. In 1860, when these statutes were enacted in their present form,[7] women had few rights. Since then, however, their status in our society has changed dramatically. From being wholly excluded from political matters, they have secured full access to the political arena.[8] From the home, they have moved into industry; now some 30 million women comprise forty percent of the work force. And as women's roles have changed, so have societal attitudes. The recently passed equal rights statute[9] and the pending equal rights amendment demonstrate that society now considers women the equal of men.

The changed role of women in society and the changed attitudes toward them reflect the societal judgment that women can competently order their own lives and that they are the appropriate decisionmakers about matters affecting their fundamental concerns. Thus, surveying the public on the issue of abortion, the Rockefeller Commission on Population and the American Future found that fully 94% of the American public favored abortion under some circumstances and the Commission itself recommended that the "matter of abortion should be left to the conscience of the individual concerned." Similarly, the Supreme Court has said, "If the right of privacy means anything, it is the right of the individual, married or single, to be free from unwarranted governmental intrusion into matters so fundamentally affecting a person as the decision whether to bear or beget a child." Eisenstadt v. Baird, 405 U.S. 438, 92 S.Ct. 1029, 31 L.Ed.2d 349 (1972); see Griswold v. Connecticut, 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965).

The state has argued that the statutes may be justified as attempts to balance the rights of the fetus against the rights of the woman. While the Connecticut courts have not so construed the statutes,[10] we accept this characterization as

---

Tietze, Morality with Conception and Induced Abortion, 45 Studies in Family Planning 6–8 (Population Council Sept. 1969); L. Lader, Abortion 4 (1966).

7. 1860 Conn.Pub.Acts, ch. LXXI.
Connecticut's first anti-abortion statute appeared in 1821. 1821 Conn.Stat., tit. 22, § 4. The statute made it a crime to "administer . . . any deadly poison or other noxious or destructive substance, with an intention . . . thereby to murder, or thereby to cause or procure the miscarriage of any woman, then being quick with child . . . ." The maximum penalty was life imprisonment. No statute made it unlawful for the mother to abort herself.
The 1821 statute was replaced in 1830 with a law making it a crime to "administer to . . . any woman, then being quick with child, any medicine . . . or other thing, with an intention thereby to procure the miscarriage of

any such woman, or to destroy the child of which she is pregnant; or . . . use . . . any instrument . . . to procure such miscarriage, or to destroy such child." 1835 Conn.Stat., tit. 21, § 15. The penalty prescribed was from seven to ten years.
The 1830 statute was carried forward with insignificant changes into the 1854 compilation, 1854 Conn.Stat., tit. VI, § 19 and was superseded by the 1860 enactment.

8. U.S.Const. Amend. XIX, adopted in 1920.

9. 42 U.S.C. §§ 2000e to 2000e–15. See also Reed v. Reed, 404 U.S. 71, 92 S.Ct. 251, 30 L.Ed.2d 225 (1971); cf. Stanley v. Illinois, 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972).

10. The statutes, infrequently considered by the Connecticut courts, have been construed as advancing two distinct legislative goals: inhibition of promiscuous

one fairly drawn from the face of the statutes. Nevertheless we hold that the state's interest in striking this balance as it has is insufficient to warrant removing from the woman all decisionmaking power over whether to terminate a pregnancy.

The state interest in taking the determination not to have children from the woman is, because of changing societal conditions, far less substantial than it was at the time of the passage of the statutes. The Malthusian specter, only a dim shadow in the past, has caused grave concern in recent years as the world's population has increased beyond all previous estimates. Unimpeachable studies have indicated the importance of slowing or halting population growth.[11] And with the decline in mortality rates, high fertility is no longer necessary to societal survival.[12] Legislative and judicial responses to these considerations are evidenced by the fact that within the last three years 16 legislatures have passed liberalized abortion laws [13] and 13 courts have struck down restrictive anti-abortion statutes similar to those of Connecticut.[14] In short, population growth

sexual relationships by prohibiting escape from unintentional pregnancy, and the protection of pregnant women from the dangers of nineteenth century surgery. State v. Carey, 76 Conn. 342, 352, 56 A. 632, 636 (1904). However laudable a purpose the goal of reducing the frequency of promiscuous sexual relationships may have been considered one hundred years ago, it does not amount to a compelling interest today in the face of changed moral standards. Moreover, advances in medical science since 1860 have made abortion in the early stages of pregnancy no more dangerous than childbirth. Only a narrowly drawn statute prohibiting abortions endangering the life of the pregnant woman would be justified in light of a legislative intent to protect the woman's health. See United States v. Robel, 389 U.S. 258, 88 S.Ct. 419, 19 L.Ed.2d 508 (1967).

11. Presidental Commission on Population Growth and the American Future (hereinafter Rockefeller Report); D. H. Meadows, D. L. Meadows, J. Randers, W. Behrens III, The Limits to Growth (1972).

12. Rockefeller Report at Galley I-4.
    "Reproductive decisions should be freely made in a social context without pronatalist pressures—the heritage of a past when the survival of societies with high mortality required high fertility. The proper mission for government in this matter is to ensure the fullest opportunity for people to decide their own future in this regard, based on the best available knowledge; then the demographic outcome becomes the democratic solution."

13. Four states allow abortion upon a woman's request, 11 Alaska Stat. § 11.15.060; Hawaii Stat. tit. 25, § 453-16; New York Penal Law, McKinney's Consol.Laws c.

40, § 125.05 (1971 Supp.); Wash.Rev. Code Ann. § 9.02.060 (1971 Supp.) and 12 others allow abortion if the pregnancy presents a danger to the physical or mental health of the mother or is a result of rape or incest, 41 Arkansas Stat., § 304; California Health and Safety Code §§ 25950-55 (West Supp.1971); Colorado 1971 Session Laws, art. 6, § 40-6-101; 24 Del.Code Ann. § 1790; 29 Ga.Code Ann. § 9925a (1971 Supp.); 21 Kan.Stat. Ann. § 3407 (1971 Supp.); 43 Md.Code Ann. § 137 (1971 Supp.); N.M.Stat. 40A-5-1 (1971 Supp.); N.C.Gen.Stat. § 14-45.1 (1971 Supp.); Or.Rev.Stat. § 435.415; S.C.Code Ann. § 16-87 (1971 Supp.); Va.Code 18.1-62.1 (1971 Supp.).

14. Eight decisions are reported. YWCA v. Kugler, 342 F.Supp. 1048 (D.N.J.1972); Doe v. Scott, 321 F.Supp. 1385 (N.D.Ill. 1971), app. docketed sub nom. Hanrahan v. Doe, 39 U.S.L.W. 3438; Doe v. Bolton, 319 F.Supp. 1048 (N.D.Ga.1970) prob. juris. postponed to hearing on the merits, 402 U.S. 941, 91 S.Ct. 1614, 29 L.Ed.2d 109 (1971); Roe v. Wade, 314 F.Supp. 1217 (N.D.Tex.1970), prob. juris. postponed to hearing on the merits, 402 U.S. 941, 91 S.Ct. 1610, 29 L.Ed.2d 108 (1971); Babbitz v. McCann, 310 F.Supp. 293 (E.D.Wisc.1970), appeal dismissed, 400 U.S. 1, 91 S.Ct. 12, 27 L.Ed.2d 1 (1971); People v. Belous, 71 Cal.2d 954, 80 Cal.Rptr. 354, 458 P.2d 194 (1969), cert. denied, 397 U.S. 915, 90 S.Ct. 920, 25 L.Ed.2d 96 (1970); People v. Barksdale, 1 Crim.L.Bull. 9526 (Cal.Dist.Ct. of App. July 2, 1971); State v. Barquet, 262 So.2d 431 (Fla.Sup.Ct., Feb. 14, 1972). The remainder have been cited to us by the plaintiffs. People v. Robb, No. 149005, 159061 (Munic.Ct Orange County, Cal. Jan. 9, 1970); Florida v. Sachs (Alachua County Court of Record Dec. 10, 1971); Commonwealth v. Page,

must be restricted, not enhanced and thus the state interest in pronatalist statutes such as these is limited.[15]

■ Moreover, these statutes restrict a woman's choice in instances in which the state interest is virtually nil. The statutes force a woman to carry to natural term a pregnancy that is the result of rape or incest. Yet these acts are prohibited by the state at least in part to avoid the offspring of such unions. Forcing a woman to carry and bear a child resulting from such criminal violations of privacy cruelly stigmatizes her in the eyes of society. Similarly, the statutes require a woman to carry to natural term a fetus likely to be born a mental or physical cripple. But the state has less interest in the birth of such a child than a woman has in terminating such a pregnancy. For the state to deny therapeutic abortion in these cases is an overreaching of the police power.

Balancing the interests, we find that the fundamental nature of the decision to have an abortion and its importance to the woman involved are unquestioned, that in a changing society women have been recognized as the appropriate deci-sionmakers over matters regarding their fundamental concerns, that because of the population crisis the state interest in these statutes is less than when they were passed and that, because of their great breadth, the statutes intrude into areas in which the state has little interest. We conclude that the state's interests are insufficient to take from the woman the decision after conception whether she will bear a child and that she, as the appropriate decisionmaker, must be free to choose. What was considered to be due process with respect to permissible abortion in 1860 is not due process in 1972.[16]

■ The essential requirement of due process is that the woman be given the power to determine within an appropriate period after conception whether or not she wishes to bear a child. Of course, nothing prohibits the state from promulgating reasonable health and safety regulations surrounding abortion procedures.

In holding the statutes unconstitutional, we grant only declaratory relief to this effect as there is no reason to be-

---

No. 19–353 (Penn.Ct. of Common Pleas, Centre County, Nov. 27, 1970) ; State v. Ketchum (Mich.Dist.Ct. March 30, 1970) ; South Dakota v. Munson (Cir.Ct. Pennington Cty., April 20, 1970). See also Poe v. Menghini, 339 F.Supp. 986 (D. Kan.1972) (striking down abortion statute that required all abortions to be approved by three physicians and to be performed in state accredited hospitals) ; Mc-Garvey v. Magee-Womens Hospital, 340 F. Supp. 751 (D.W.Pa.1972) (holding fetus not a "person" within 14th Amendment and hence lacks standing to bring suit enjoining abortions performed in hospital).

15. Rockefeller Report at Galley I–1.
    "In the brief history of this nation, we have always assumed that progress and 'the good life' are connected with population growth. In fact, population growth has frequently been regarded as a measure of our progress. If that were ever the case, it is not now. There is hardly any social problem confronting this nation whose solution would be easier if our population were larger. Even now, the dreams of too many Americans are not being realized ; oth-ers are being fulfilled at too high a cost. Accordingly, this Commission has concluded that our country can no longer afford the uncritical acceptance of the population growth ethic that 'more is better.' And beyond that, after two years of concentrated effort, we have concluded that no substantial benefits would result from continued growth of the nation's population."

16. "Due process has not been reduced to any formula ; its content cannot be determined by reference to any code. The best that can be said is that through the course of this Court's decisions it has represented the balance which our Nation, built upon postulates of respect for the liberty of the individual, has struck between that liberty and the demands of organized society . . . The balance . . . is struck . . . having regard to what history teaches are the traditions from which it developed as well as the traditions from which it broke. That tradition is a living thing." Poe v. Ullman, 367 U.S. 497, 542, 81 S.Ct. 1752, 1776, 6 L.Ed.2d 989 (1961) (Harlan, J., dissenting).

lieve that the state will not obey our mandate.[17]

NEWMAN, J, concurs in the result with a separate opinion.

NEWMAN, District Judge (concurring in the result):

I fully agree with Judge Lumbard's conclusion that the plaintiffs are entitled to a judgment declaring the Connecticut abortion statutes unconstitutional, but my reasons for reaching that conclusion cover somewhat less ground. Moreover, having found the statutes unconstitutional, I would grant plaintiff Doe injunctive relief.

## I

The essential contention of plaintiff Doe is that the Connecticut abortion statutes unconstitutionally invade her privacy in matters of family and sex. While the Constitutional basis for this claim is imprecise, there can be no doubt after Griswold v. Connecticut, 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965), that the Supreme Court recognizes a Constitutionally protected zone of privacy in these matters, founded on either the Ninth Amendment[1] or the "penumbras" of the First, Third, Fourth, Fifth and Ninth Amendments as incorporated by the Fourteenth Amendment[2], or the concept of liberty protected by the Fourteenth Amendment alone[3].

Having recognized a right to privacy in family and sexual matters, however, the Court has not created an immunity against all state regulation of these subjects. Rather the Court has required the demonstration of a subordinating state interest sufficient to justify the invasion of privacy. Before there can be consideration of whether the state interest does justify the invasion of privacy, there must be a determination of what state interest is being advanced by these statutes.

In this case the State suggests the 1860 General Assembly, which enacted the statutes here challenged, was seeking to advance three state interests: protecting the health of the mother, protecting the morals of the mother, and protecting the life of the unborn child. Determining whether these were the state interests is not an easy task, because of the paucity of relevant materials. These statutes contain no legislative findings, nor are there available legislative committee hearings or reports, or floor debate. Since ascertainment of the state interest is an important step in determining whether or not the state may invade an area of personal liberty entitled to a high order of protection, the inquiry as to what state interest was being advanced by the 1860 General Assembly must proceed with some caution, and a clear demonstration of the requisite state interest should be required. Consideration must be given to (a) the evils that were perceived as requiring legislation in 1860, (b) the background of the Connecticut statutes, (c) the text of the statutes, (d) relevant judicial interpretation of these statutes, and (e) contemporary materials from other states pertinent to the same type of statutes.

(a). A scholarly analysis of Nineteenth Century abortion legislation by

---

17. The state has argued that since the constitutionality of these statutes is sub judice before the Connecticut Supreme Court of Errors and Appeals, we should abstain from action in the instant case. We decline to do so. None of the plaintiffs here are parties to the state actions nor would they be bound by the Connecticut court's decision. Neither have they been subjected to state criminal prosecutions. Yet there is a sufficient controversy between the parties to satisfy the requirements of Article III, § 2 of the Constitution. Zwickler v. Koota, 389 U.S. 241, 88 S.Ct. 391, 19 L.Ed.2d 444 (1967).

1. 381 U.S. at 486–499, 85 S.Ct. 1678 (Goldberg, J., concurring).

2. 381 U.S. at 484, 85 S.Ct. 1678 (Douglas, J.).

3. 381 U.S. at 499–502, 85 S.Ct. 1678 (Harlan, J., concurring in the result).

Professor Cyril C. Means, Jr. has outlined solid evidence for concluding that the major evil perceived at the time that was posed by an abortion was the risk to the health and life of the mother[4]. With Lister's pioneering article on antiseptic surgery not published until 1867, abortions performed before that date, even under the best of then known medical practices, created grave risks for the health and life of the mother. There can be no doubt that this was an evil known to and appreciated by the Nineteenth Century legislators. Whether they were concerned about protecting the morals of the mother is uncertain. Professor Means finds no evidence of this concern in his review of contemporary materials[5]. Protecting the life of the unborn child was certainly of concern to some Nineteenth Century thinkers. Although some did not accept a meaningful concept of life until birth, there was substantial support for both the principle of mediate animation and immediate animation at conception[6]. To what extent these views were held by legislators of that Century is most uncertain. While there is evidence that in some states they regarded a quickened fetus as a life entitled to legal protection[7], there is inadequate evidence to gauge their assessment of an unquickened fetus.

(b). Early Connecticut statutes prohibited any person from administering any poison (1821) and later administering any medicine or using any instrument (1830) with intent to cause the miscarriage of a woman quick with child[8]. Prior to 1860, it was not a crime in Connecticut for a woman to cause her own miscarriage. The statutes challenged in this suit were enacted in 1860[9]. A mother's doing or suffering anything to be done with intent to produce a miscarriage or abortion was prohibited, the "quick with child" limitation of prior law was eliminated, and an exception

4. Means, The Law of New York Concerning Abortion and the Status of the Foetus, 1664–1968: a Case of Cessation of Constitutionality, 14 N.Y.L.F. 411 (1968) ; Means, The Phoenix of Abortional Freedom: Is a Penumbral or Ninth-Amendment Right About to Arise from the Nineteenth-Century Legislative Ashes of a Fourteenth-Century Common-Law Liberty?, 17 N.Y.L.F. 335 (1971).

5. Means, 17 N.Y.L.F. at 381–82.
   It may be, however, that Professor Means' conclusion as to state laws in general has not recognized the special impact of Comstockery in Connecticut, where nonprocreative sexual relations were considered an evil necessitating in 1879 a ban on the use of contraceptives. See note 14, infra.

6. While the issue is a matter of intense religious dispute today, it is interesting to note that within Catholicism the proponents of immediate animation had not prevailed by 1860. The Council of Trent in the Sixteenth Century had decreed that no human body "can be informed by the soul of man except after the prescribed interval of time." Prior to April 5, 1713 the Church had not baptized abortive fetuses of less than thirty days. On that date a decree of the Holy Office permitted baptism of such early fetuses if there was a reasonable doubt as to whether they had received a rational soul. It was not until 1917 that Canon Law was amended to provide for the absolute baptism of all abortive fetuses, however young, with baptism "sub conditione" available where there is doubt that the fetus is alive. Indeed, so strong was the view against immediate animation that a Seventeenth Century author who suggested a theory of immediate animation was required by the Congregation of the Index to preface his book with the cautions that he was only setting forth speculation and that he was speaking only of abortive fetuses which display at least the rudimentary lineaments of human form. Means, 14 N.Y.L.F. at 413–15 n. 6. For the contours of an historical variation of viewpoint within Judaism, see id. at 412 n. 4.

7. For example, when a pregnant mother was sentenced to death for a capital crime, she was examined to determine if the fetus had quickened. If it had not, she was executed. If it had, she was reprieved to permit the quickened fetus to be born, and then the mother was executed. Ch. 442 [1881] N.Y.Laws 76; Secs. 38, 40 [1833] Ga.Penal Code. See Means, 17 N.Y.L.F. at 377.

8. Conn.Gen.Stat.(Rev.1821) tit. 22, sec. 14; Conn.Gen.Stat.(Rev.1835) tit. 21, sec. 15.

9. Ch. 71 [1860] Conn.Pub.Acts.

was created for an abortion necessary to preserve the life of the mother or the unborn child. Apparently the 1860 legislation was a response to a resolution of the American Medical Association adopted at its 1859 convention. 12 Transactions of the A.M.A. 27 (1859). That resolution urged that all state legislatures be memorialized to revise their abortion laws to help curtail the rising incidence of abortions. At the 1860 session of the Connecticut General Assembly, the memorial of the A.M.A. was referred to the Judiciary Committee, whose report recommended that the "prayer of the memorial" be granted and that an accompanying bill be enacted. 15 Conn. House Journal 510 (1860). That bill became the abortion legislation of 1860, and is now, with minor wording changes, Sections 53–29, 53–30 and 53–31 of the Connecticut General Statutes. One phrase from the A.M.A.'s resolution stated that the organization was protesting "against such unwarrantable destruction of human life." That this referred to the unborn child, rather than the mother, is made clear by the report of the A.M.A. committee which prepared the resolution. 12 Transactions of the A.M.A. 77 (1859). However, there is no evidence that the A.M.A. committee report ever came to the attention of the Connecticut legislature. Nor do the legislative journals or contemporary newspaper reports (see Hartford Courant, June 23, 1860, p. 2) indicate whether the General Assembly was accepting the thinking that underlay the A.M.A. resolution or was simply responding to the A.M.A.'s call to make abortion laws more comprehensive. The latter action could have been taken for the purpose of protecting either the mother or the unborn child. Legislative response to a resolution of the A.M.A. seems more likely to reflect a medical than a metaphysical purpose.

(c). The text of the 1860 statutes provides only slight guidance as to the state interest being advanced. There is perhaps some significance in the fact that the statutes do not define as a crime taking the life of an unborn child. *Compare* Wis.Stat. § 940.04, which punishes one who "destroys the life of an unborn child." Section 53–30 penalizes a woman "who does or suffers anything to be done, with intent thereby to produce upon herself miscarriage or abortion." The statutory crime is complete even if no harm is done to the unborn child. This at least suggests that the statute may be concerned with what an abortion does to a mother, not what it does to a fetus. The statutory penalty may also offer a clue. Of course the setting of penalties is normally a matter within a legislature's discretion, but the amount of penalty established is at least one indication of the purpose the legislature had in defining the crime. The maximum penalty for violating Section 53–30 is two years, compared to the ten-year penalty for manslaughter in 1860 [10]. Two years is a remarkably low penalty if the crime it punishes is the intentional taking of a life. Such a penalty is more consistent with a purpose to protect health or morals. In a related context, the Supreme Court has recently placed great reliance on statutory penalties in determining statutory purpose. Eisenstadt v. Baird, 404 U.S. ——, 92 S.Ct. 1029, 31 L.Ed.2d 349 (1972). The fact that the 1860 statutes eliminated the "quick with child" limitation does not determine purpose; the reason could as easily have been more comprehensive protection of all mothers as all fetuses.

(d). Only one decision of the Connecticut Supreme Court, State v. Carey, 76 Conn. 342, 56 A. 632 (1904), sheds any light on the purpose of the Connecticut abortion statutes, but it is especially instructive. The issue in *Carey* was whether the trial court had erred in failing to instruct the jury in the trial of an abortionist that the testimony of the consenting mother should be considered with the caution normally applied to the testimony of an accomplice. Resolution of this question required the court to make several observations about the pur-

---

10. Conn.Gen.Stat.(1866 Rev.) tit. 12, sec. 9.

poses of Section 53–29, punishing the abortionist, and Section 53–30, punishing the mother. The court began its analysis of the question by noting the law's distinction between "a man's injuring his own body" and "the crime that may be committed by another in inflicting such injury." *Id.* at 351, 56 A. at 636. The court also noted that "taking his own life is a thing distinct from the crime of murder." *Id.* at 350, 56 A. at 636. Reasoning from this distinction, the court concluded that the woman is not an accomplice to the abortionist's crime. A necessary part of this reasoning was acceptance of the premise that when a woman consents to an abortion, the only legally cognizable injury she is risking is the injury to herself, and not to the unborn child [11]. For if the unborn child was safeguarded by the statute, then the woman would be participating in the criminal injury of another person and hence would be an accomplice to the abortionist's crime [12].

Clear evidence that this reasoning in fact led to the court's conclusion is the following passage:

> "The criminal intent and moral turpitude involved in the violation by a woman of the restraint put upon her control over her own person is widely different from that which attends the man who, in clear violation of law, and for pay or gain of any kind, inflicts an injury on the body of a woman endangering health *and perhaps life*."

*Id.,* at 352–353, 56 A. at 636 (emphasis added). Plainly the court saw Section 53–29 as a statute that protected the mother from an injury that endangered her health and perhaps even her life. Nothing in the court's opinion gives any recognition to the idea that the unborn child was a life entitled to the protection of the statute. Since the objective of every abortion is to destroy the fetus and the objective is almost always achieved, the court could not possibly have been referring to the unborn child when it characterized Section 53–29 as a statute that "perhaps" endangers life.

Furthermore, in contrasting the crimes of the mother and the abortionist, the court gave its view of the purposes underlying Section 53–30:

> "The public policy which underlies this legislation is based largely on protection due to the woman—protection against her own weakness as well as the criminal lust and greed of others."

*Id.* at 352, 56 A. at 636. In the context of the court's opinion, protecting the woman "against her own weakness" means protecting her own health and perhaps life against the risk of a dangerous operation to which she might be tempted to submit. Protecting her against the "greed of others" apparently refers to the greed of the abortionist for "pay or gain of any kind." But protecting her from the "criminal lust" of others most likely refers to a totally different purpose—deterring fornication [13]. The only way the statute can protect her from the lust of others is by warning her not to engage in sexual relations on pain of having to bear any child that might be conceived. This pur-

---

11. This reasoning was spelled out by one of the cases upon which *Carey* relied, State v. Ilyer, 39 N.J.L. 598, 600 (1877), which stated that the woman is not an accomplice because the offense of the abortionist (under a statute similar to Sec. 53–29) is not against the unborn child but against the health and life of the mother.

12. On this reasoning, state courts that have said the abortion statute of their state protects the unborn child have also said, with reference to the abortionist's crime, that the consenting mother should be punished as a principal. State v. Alcorn, 7 Idaho 599, 64 P. 1014 (1901); *see also* Steed v. State, 27 Ala.App. 263, 170 So. 489 (1936). And this reasoning has led one court to depart from the majority rule and hold that a consenting mother is an accomplice to the abortionist's crime so that an accomplice charge is required. State v. McCoy, 52 Ohio St. 157, 39 N.E. 316 (1894).

13. *Carey* was not unaware that "criminal lust" and "greed" could motivate the same person. 76 Conn. at 354, 56 A. 632.

pose of inhibiting non-procreative sexual relations may well have been part of the underlying state interest in 1860, just as it was to be in 1879 when the General Assembly banned the use of contraceptives [14].

Thus the Connecticut Supreme Court, from a perspective far more relevant to an understanding of 1860 legislative thinking than the present, viewed the major interest underlying the abortion statutes as protection of the health of the mother. An additional interest may have been protection of the morals of the mother. And the court, by reasoning necessary to support the precise holding of the case, assumed that the statutes were not designed to protect the life of the unborn.

(e). Contemporary materials from other states that might shed light on the purposes of their Nineteenth Century abortion statutes are scarce. Professor Means' exhaustive analysis of the history of the New York legislation demonstrates that protection of the mother's health was the purpose of that state's laws. Means, 14 N.Y.L.F. 411, *supra.* The same conclusion was reached by the old New Jersey Supreme Court, only nine years after that state's statute was enacted [15].

With all these considerations in mind the question to be faced is whether the state interests being advanced in 1860 are today sufficient to justify the invasion of the mother's liberty. I agree with Judge Lumbard that protecting the mother's health, which plainly was a state interest in 1860 and may well have provided a valid state interest for these statutes when enacted, will not furnish a subordinating state interest today, when the mother's life is exposed to less risk by abortion than by childbirth [16].

The second justification advanced by the state, protecting the mother's morals, may well have been an objective in 1860. This justification apparently proceeds from the premise that if abortion is prohibited, the threat of having to bear a child will deter a woman from sexual intercourse. Protecting the morals of the mother thus turns out to mean deter-

---

14. Ch. 78 [1879] Conn.Pub.Acts.

When the Connecticut contraceptive statute was finally reviewed on the merits by the Supreme Court, Griswold v. Connecticut, 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965), Justice White was charitable enough to view the statute as having as its purpose the inhibiting of only illicit sexual relations. 381 U.S. at 505, 85 S.Ct. 1678 (concurring opinion). That was the purpose advanced by counsel for the state. But plainly the statute made no distinction between use by married and unmarried couples. Moreover, the Connecticut Supreme Court had previously pointed out, in upholding the statute, that a proper legislative purpose was to inhibit all non-procreative sexual relations, not just illicit relations. State v. Nelson, 126 Conn. 412, 424, 11 A.2d 856, 861 (1940) :

"Whatever may be our own opinion regarding the general subject, it is not for us to say that the Legislature might not reasonably hold that the artificial limitation of even *legitimate* child-bearing would be inimical to the public welfare." (Emphasis added).

Moreover, the court quoted with approval the following language from Commonwealth v. Allison, 227 Mass. 57, 62, 116 N.E. 265 (1917), commenting on the purposes of statutes including the Massachusetts contraceptive statute on which the Connecticut statute was modeled :

"Their plain purpose is to protect purity, to preserve chastity, to encourage continence and self restraint . . . . " 126 Conn. at 425, 11 A.2d at 862.

15. State v. Murphy, 27 N.J.L. 112, 114–115 (1858) :

"[The abortionist statute] was not to prevent the crime of abortion so much as to guard the health and life of the mother against the consequences of such attempts. The guilt of the defendant is not graduated by the success or failure of the attempt; it is immaterial whether the foetus is destroyed or whether it is quickened or not; in either case the degree of the defendant's guilt is the same."

16. Professor Means has persuasively argued that the constitutionality of abortion statutes based on protection of the mother's health ended sometime between 1900 and 1933 when, according to medical statistics, the mortality rate for physician-performed abortions dropped below the mortality rate for childbirth. Means, 17 N.Y.L.F. at 384–87.

ring her from having sexual relations. But the Supreme Court has decided that such a purpose cannot validate invasion of a woman's right to privacy in matters of family and sex. Griswold v. Connecticut, *supra;* Baird v. Eisenstadt, *supra*[17].

That leaves the state's third justification, protecting the life of the unborn child. Judge Lumbard is willing to assume this was a purpose of the 1860 legislature and finds it constitutionally insufficient. Judge Clarie concludes it was in fact a purpose of the 1860 legislature and finds it constitutionally sufficient. With deference, I am persuaded that protecting the life of the unborn child was most likely not a purpose of the 1860 legislature. At a minimum it has not been shown with sufficient certainty that this was the legislature's purpose as to warrant a weighing of this purpose against the mother's constitutionally protected rights. Whether a fetus is to be considered the sort of "life" entitled to the legal safeguards normally available to a person after birth is undeniably a matter of deep religious and philosophical dispute. If the Connecticut legislature had made a judgment on this issue and had enacted laws to accord such protection to the unborn child, the constitutionality of such laws would pose a legal question of extreme difficulty, since the legislative judgment on this subject would be entitled to careful consideration. *Cf.* Byrn v. New York City Health and Hospitals Corp., 329 N.Y.S.2d 722 (App. Div., 2d Dept., 1972), upholding a permissive abortion statute and concluding that the degree of protection to be accorded an unborn child is appropriately a matter for legislative determination. Since that legislative determination has not been shown to have been made, I think it is inappropriate to decide the constitutional issue that would be posed if such a legislative justification was before us.

Because I believe the only interests which the 1860 legislature was seeking to advance are not today sufficient to justify invasion of the plaintiff's constitutionally protected rights, I join with Judge Lumbard in holding these statutes unconstitutional.[18]

17. If the state interest in protecting the morals of the mother was the deterrence of illicit sexual relations, *Griswold* makes it clear that this purpose cannot constitutionally be achieved by a statute which includes married women within its coverage. To the extent that the state interest in protecting the morals of the mother was the deterrence of all non-procreative sexual relations (and this seems the more likely interpretation since the abortion statutes make no distinction between married and unmarried women), the First Circuit's decision in *Baird* explicitly forecloses such an approach, 429 F.2d 1398, 1402 (1st Cir. 1970), and the Supreme Court's affirmance tends to support not only the First Circuit's conclusion, but perhaps the unconstitutionality of abortion statutes as well, 405 U.S. 438, 453, 92 S.Ct. 1029, 1038, 31 L.Ed.2d 349 (1972):
> "If the right of privacy means anything, it is the right of the *individual,* married or single, to be free from unwarranted governmental intrusion into matters so fundamentally affecting a person as the decision whether to bear or beget a child." (emphasis original).

18. A conclusion of unconstitutionality of a state statute despite the existence of a state interest that might be sufficiently compelling if actually considered by a legislature inevitably involves an inquiry into the murky area of legislative purpose. *See* Ely, Legislative and Administrative Motivation in Constitutional Law, 79 Yale L.J. 1205 (1970). As Professor Ely has demonstrated, the ground rules for such an inquiry are not clear, nor have the "rules" been consistently applied. When a statute is challenged as being beyond the scope of an enumerated Congressional power or a generalized state police power, the inquiry is usually stated to be whether the legislature might rationally have been pursuing an objective that is within the scope of its power. *See, e. g.,* Second Employers' Liability Cases, 223 U.S. 1, 48, 32 S.Ct. 169, 56 L.Ed. 327 (1912); Wickard v. Filburn, 317 U.S. 111, 128–129, 63 S.Ct. 82, 87 L.Ed. 122 (1942); West Coast Hotel Co. v. Parrish, 300 U.S. 379, 397–399, 57 S.Ct. 578, 81 L.Ed. 703 (1937). However, when a statute is challenged as invading an area of constitutionally protected liberty, some decisions appear to be searching not for a compelling national

or state interest that is merely a rational possibility, but for an interest that was in fact being advanced by the legislature. In American Communications Assn. v. Douds, 339 U.S. 382, 70 S.Ct. 674, 94 L.Ed. 925 (1950), the Court weighed, as against First Amendment values, not what Congress might have been thinking but what "Congress has concluded," what "Congress had as its objective," and what was the "manifest purpose" of Congress. *Id.* at 404, 407, 70 S.Ct. 674. Similarly in McLaughlin v. Florida, 379 U.S. 184, 192, 85 S.Ct. 283, 289, 13 L.Ed.2d 222 (1964), the Court was not willing to speculate as to whether the state legislature might have had a compelling interest to justify a racial classification; the Court said its inquiry was "whether there clearly appears in the relevant materials some overriding statutory purpose." And in an especially relevant context the Court has recently made a searching inquiry to determine the actual purpose of the Massachusetts contraceptive legislation, Baird v. Eisenstadt, *supra.*

In cases under the Establishment Clause, the Court has not upheld statutes because a secular purpose might rationally be postulated; the Court has insisted that there be a demonstration that the legislature in fact acted to achieve a secular purpose. McGowan v. Maryland, 366 U.S. 420, 429–453, 466–511, 81 S.Ct. 1101, 6 L.Ed.2d 393 (1961); Lemon v. Kurtzman, 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971); Tilton v. Richardson, 403 U.S. 672, 91 S.Ct. 2091, 29 L.Ed.2d 790 (1971). And where statutes are challenged as imposing cruel and unusual punishment or being a bill of attainder, the Court has not avoided these claims by speculating that a non-penal purpose might have existed; it has sought to determine whether in fact the legislative purpose was penal or non-penal. Trop v. Dulles, 356 U.S. 86, 95–97, 78 S.Ct. 590, 2 L.Ed.2d 630 (1958); United States v. Brown, 381 U.S. 437, 456–462, 85 S.Ct. 1707, 14 L.Ed.2d 484 (1965).

Sometimes the Court will consider a legislative purpose that plainly was not contemplated by the legislature, but normally this occurs only when the Court has already found the manifest purpose insufficient and simply goes on to reject the sufficiency of even conjectural purposes. *See, e. g.,* Meyer v. Nebraska, 262 U.S. 390, 403, 43 S.Ct. 625, 67 L.Ed. 1042 (1923) (rejecting sufficiency of state purpose to limit children's mental activities after manifest purpose of promoting English as mother tongue was already rejected). And there may be a few instances where the Court has sustained a statute as achieving a purpose other than the one most likely intended by the legislature. *See, e. g.,* Railway Express Agency v. New York, 336 U.S. 106, 69 S.Ct. 463, 93 L.Ed. 533 (1949) (sustaining legislative discrimination between owner and renter truck advertising on grounds of different traffic hazards, rather than economic assistance). But such cases are extremely rare (Ely, *supra,* at 1215 n. 31), and when they occur, they uphold legislative economic classifications, not infringements of personal liberty.

In judging the statutes in the present case, the issue is whether the invasion of the mother's personal liberty should be weighed against the conjectural purpose of protecting the life of the fetus, once the manifest purpose of protecting the mother's health has been found insufficient. No case has been called to our attention that mandates such an adjudicatory process. Once a statute is shown to impair a constitutionally protected freedom, there is no reason to presume that the legislature would want that freedom impaired just because a rational purpose can later be postulated. On the contrary, more respect is shown to a legislature, and to constitutional freedoms, if the only state interest weighed against the impaired freedom is the interest which the legislature sought to advance in enacting the challenged statute. If there can be suggested some other state interest that might justify impairment of the freedom, the legislature should have the opportunity of deciding whether it chooses to advance such an interest. Its affirmative decision might still be unconstitutional, but a reviewing court will then have before it a full development of the competing interests. Such an approach is especially appropriate here, where a purpose that the legislature clearly was advancing was sufficient to support the legislation when enacted, but has been rendered insufficient by subsequent factual developments in medicine. In such circumstances, for a court to keep legislation in force by attributing to a legislature a purpose that the legislature most likely did not have is only a subtle but nonetheless substantial usurpation of the legislation function. Such a course would be based on the totally unrealistic assumption that, as to politically sensitive public issues, failure to repeal is the equivalent of a decision to enact.

## II

As to the propriety of injunctive relief, plaintiff must show some equities more substantial than her desire to avoid the expense or inconvenience of defending a criminal prosecution. Douglas v. City of Jeannette, 319 U.S. 157, 63 S.Ct. 877, 87 L.Ed. 1324 (1943). If the abortion of plaintiff Doe required only action on her part, it would be doubtful whether she could sustain her burden. But manifestly that is not the case. She desires to have an abortion performed by competent medical authorities. If she has the constitutional right to an abortion free of the threat of Section 53–30, it must follow that she has an equal right to secure appropriate medical assistance. But however willing plaintiff Doe might be to endure criminal prosecution, it is obvious that she cannot compel her physician to share the hazards of such litigation. Thus, she may well not have an abortion performed by her physician unless criminal prosecution of her doctor and those acting with him is enjoined. Therefore, plaintiff Doe has demonstrated that her need for an injunction is based on more than her desire to avoid a criminal prosecution of herself. It is based on the need to achieve the benefit of the declaratory judgment to which she is entitled. It may well be that the state will abide by the declaratory judgment and make no move to prosecute those who act in reliance upon this court's judgment. But the plaintiff should not be limited in her choice of doctors to those who are willing to accept the prediction that the state will not prosecute or the legal advice that any such prosecution would ultimately be unsuccessful. I believe she is entitled to select any competent medical personnel she chooses, assured by an injunction that there will be no prosecution.

CLARIE, District Judge (dissenting):

I respectfully disagree and accordingly dissent from the majority opinion. This Court's bold assumption of judicial-legislative power to strike down a time-tested Connecticut Statute constitutes an unwarranted federal judicial intrusion into the legislative sphere. The state legislature long ago made a basic choice between two conflicting human values. It chose to uphold the right of the human fetus to life over a woman's right to privacy and self-determination in sexual and family matters. The legislature has repeatedly refused to alter this decision to the present date.

The majority has reached out and grasped at the nebulous supposition that the protection of fetal life is not the purpose of the Connecticut anti-abortion laws. This assumption is unwarranted. The history of these statutes indicates that they were designed to protect fetal life.

In 1821, the Connecticut legislature adopted the first anti-abortion statute in this country. The legislature in its original treatment of the subject equated abortion with the crime of murder by poison.[1] The 1860 amendment for the first time recognized that the mother also was capable of committing a crime by submitting to the abortion. This amendment made it plain that the legislature regarded both the fetus and the woman as the victims of the abortion.

Prior to 1860, the Connecticut statutes concerned only abortions performed up-

---

1. Statute of 1821, Title 22, § 14, p. 152:
   *"Administering poison with intent to murder or cause miscarriage:*

   "Any person who administers a poison or other noxious substance with intent to murder, or cause or procure the miscarriage of any woman, then being quick with child shall be imprisoned for life or such other term as the court determines."

on a woman "quick with child." This indicates a legislative determination that human "life" began at that point. The statute of 1860 amended that law to forbid abortion at any stage of fetal development. This amendment reflected a legislative judgment that fetal life at any stage merited the protection of the law.[2] If the primary purpose of the anti-abortion laws was to protect the woman from the dangers of 19th century surgical techniques, as the majority suggests, it is impossible to understand why the original law prohibited abortions only after quickening. Certainly, the risk of infection caused by unsterilized instruments was as great before the fetus had quickened.

State v. Carey, 76 Conn. 342, 56 A. 632 (1904), has been pointed to as authority for the proposition that the anti-abortion statutes are aimed "largely" at protecting the woman and not the unborn child. Actually, *Carey* was decided on a completely different issue of law, namely, whether or not the woman is an accomplice to the crime of the abortionist, for the purpose of attacking her credibility. The court reasoned that while the woman could not be an accomplice to the crime of the abortionist, she could be guilty of committing a separate and distinct

---

2. "The public policy underlying the abortion laws in Connecticut is open to debate, but the legislative history supports the theory that the abortion laws are an extension of the colonial murder law. Risking the lives of the gravida (the pregnant woman) or the quickened fetus was first discouraged by punishment of certain acts done for the purpose of causing a miscarriage. By 1860, a growing acceptance of the concept that the fetus is a human being from conception challenged the Connecticut legislators to make some basic choices. They adopted a policy of equal protection of the gravida and her fetus as is evidenced by the statutory language which accorded them equality of the status under the law. (the 1860 statute proscribed an abortion "unless the same shall have been necessary to preserve the life of such woman, or of her unborn child.") Deterrence of the woman's acts was necessary under this policy, but perhaps compassion for her poignant situation prompted a lower penalty for her offense. Only abortions medically indicated as necessary to preserve the life of the woman or the child are allowed." A Report to the Connecticut Criminal Law Revision Commission; The Connecticut Abortion Statutes: Legislative History, Case Law Development, Comparative Analysis, some Recommendations, by Laura A. Pope, at 15–16 (1966).

In May, 1859, the House of Delegates of the American Medical Association adopted a resolution "condemning the act of producing abortion at every period of gestation, except as necessary for preserving the life of the mother or child." Digest of Official Actions, 1846–1958, American Medical Association, at 68 (1959).

Further indication of the concern for the fetus in the 19th century is provided by the medical journals of that period. Dr. Isaac N. Quimby, for example, criticized laws which proscribed abortion only after quickening:

"This ancient, but now exploded theory that life in the foetus does not commence until the third or fourth month of gestation, is founded upon ignorance and the misconception of facts—and contrary to the revealed truths and investigations of modern science.

"This fallacious idea that there is no life until quickening takes place, has been the foundation of, and formed the basis, and been the excuse to ease or appease the guilty conscience, which has led to the destruction of thousands of human lives.

·        ·        ·        ·        ·

"Should we not then assert most positively that the life of the foetus commences at the moment conception takes place, and therefore the destruction of the foetus, at any period of gestation, should constitute murder?" Quimby, "Introduction to Medical Jurisprudence," Journal of the American Medical Association, Vol. 9, at 164 (1887). *See also*, Markham, "Foeticide and its Prevention," Journal of the American Medical Association, Vol. 11, p. 805 (1888).

crime under the statute, namely, submitting to an abortion. It was in that context that the issue arose as to whether the trial judge committed error in failing to charge the jury that the testimony of the woman must be "suspect," because she was an accomplice to the crime. The court's reasoning on that evidentiary issue led to the incidental dicta, that the laws were aimed "largely" to protect the woman. The court emphasized that the woman was not an accomplice, but rather a victim of the abortionist's crime for evidentiary purposes. This approach safeguarded the credibility of the only likely prosecution witness in abortion cases. The statute also afforded some justification for this position, in that one of the purposes of the law included the protection of the woman. However, this circumstance does not detract from the statute's primary purpose, the protection of the human fetus.

The majority's seizure of this single, isolated dictum articulated some 68 years ago and their reliance upon it as a main girder to support their position, is not only misplaced, but rises to the level of pedanticism, in light of the evidence of the present legislative purpose. *Cf.* McGowan v. Maryland, 366 U.S. 420, 81 S. Ct. 1101, 6 L.Ed.2d 393 (1961).

The real issue here is whether or not the laws were designed to carry out a compelling state interest. Contrary to the majority's holding in this case, I respectfully submit that the Connecticut anti-abortion statutes do protect fetal life as a "compelling subordinating state interest." Griswold v. Connecticut, 381 U.S. 479, 496–497, 85 S.Ct. 1678, 1688, 14 L.Ed.2d 510 (1965) (Goldberg, J., concurring). As such, they are, therefore, a constitutionally valid and a proper exercise of the power of the state. I would uphold these state laws, and deny relief. *See,* Corkey v. Edwards, 322 F.Supp. 1248, 1254 (W.D.N.C.1971); Steinberg v. Brown, 321 F.Supp. 741 (N. D.Ohio 1970); Rosen v. Louisiana State Board of Medical Examiners, 318 F.Supp. 1217 (E.D.La.1970).

Certainly, it is natural for a state to feel a compelling need to protect the human fetus.[3] Indeed, it is difficult to imagine a more basic legislative concern than the protection of life itself.

"(I)n view of the varied opinions in medical science, is not the determination of when human life commences better left to the legislature, rather than the courts?" Doe v. Scott, 321 F.Supp. 1385, 1395 (N.D.Ill.1971) (Campbell, J., dissenting).

If there is ever to be any modification as to the stage of fetal development at which the fetus is to be protected as a human being, that decision is one uniquely suited to the legislature.

The case of *Griswold, supra,* which is relied upon by the majority, decided that the state could not, consistent with the zone of privacy emanating from the Bill of Rights, completely prohibit the use of contraceptives. The Court ruled that prohibiting contraceptives served no compelling state purpose. However, this decision is not applicable to the facts of the present case. It is one thing to prevent the impregnation of the ovum by the spermatazoa, and quite another to deliberately destroy newly formed human life. Different values are invoked.

3. It is instructive to note that the law has long recognized the fetus as a person for both tort law and property law purposes. *See, e. g.,* Bonbrest v. Kotz, 65 F.Supp. 138 (D.C.D.C.1946); Torigian v. Watertown News Co., 352 Mass. 446, 225 N.E.2d 926 (1967) (recovery for a 3½ month old fetus under wrongful death statute); Sinkler v. Kneale, 401 Pa. 267, 164 A.2d 93 (1960) (recovery for 1 month old fetus). *See also* Application of Pres. & Dir. of Georgetown College, 118 U.S.App.D.C. 80, 331 F.2d 1000 (1964) and Raleigh Fitkin-Paul Memorial Hospital etc. v. Anderson, 42 N.J. 421, 201 A.2d 537 (1964), cert. denied, 377 U.S. 985, 84 S.Ct. 1894, 12 L.Ed.2d 1032 (1964).

While the marital privacy referred to in *Griswold* limits itself to the personal conjugal relationship of only two people, abortion projects itself far beyond the bounds of personal intimacy. It is directed against an innocent victim, a third human being endowed with unique genetic characteristics. The state legislature has assumed the duty of protecting this individual, and recognizes its inherent natural right to life. Moreover, even if such protection were to constitute an invasion of the marital relationship, it is not prohibited. Both the majority and dissenting opinions in Doe v. Scott, *supra*, recognized that a determination by the court that anti-abortion laws may intrude upon the sexual and familial intimacies of a woman's life is not a sufficient justification to declare them to be an invasion of constitutional rights. A superior countervailing state interest of compelling proportions is manifest here, the protection of human life.

The majority cite as an extreme illustration that the Connecticut law proscribes abortions, even in situations where the pregnancy is the result of incest or rape, or where there is a likelihood that the child will be born with a serious mental or physical defect. While it is conceded that such pregnancies and births are often fraught with personal hardship, the proper forum in which to present and test such concerns is the legislature. As Justice Frankfurter wrote for the Court in American Federation of Labor v. American Sash & Door Co., 335 U.S. 538, 557, 69 S.Ct. 260, 267, 93 L.Ed. 222 (1949):

"Courts can fulfill their responsibility in a democratic society only to the extent that they succeed in shaping their judgments by rational standards, and rational standards are both impersonal and communicable. Matters of policy, however, are by definition matters which demand the resolution of conflicts of value, and the elements of conflicting values are largely imponderable. Assessment of their competing worth involves differences of feeling; it is also an exercise in prophesy. Obviously the proper forum for mediating a clash of feelings and rendering a prophetic judgment is the body chosen for those purposes by the people." (quoted in Corkey v. Edwards, 322 F.Supp. 1248, 1254 (W.D.N.C. 1971)).

The people, acting through their legislature, have in effect decreed that this new life is an innocent victim, not an unjust aggressor.

In Steinberg v. Brown, *supra*, a three-judge court, one judge dissenting, concluded that not only may a state constitutionally protect human life in the fetal stage, but that the fifth and fourteenth amendments, which guarantee that no person shall be deprived of life without due process of law, "impose upon the state the duty of safeguarding" fetal life. 321 F.Supp. at 746-747.

Certainly, the repeated failure of the successive attempts to repeal or liberalize the anti-abortion laws can be attributed realistically, only to a legislative determination to protect fetal life.[4] As recently as December 10, 1968, the Legislative Council[5] recommended to the legislature that no legislative action should be taken on the proposal to liberalize our present laws on abortion. At page 10 in this report, it stated:

"The Council feels that should an unborn child become a thing rather than a person in the minds of people,

4. See note 2, *supra*.

5. The Council is a bi-partisan body composed of the President Pro Tempore of the Senate, the Speaker of the House of Representatives, the majority and minority leaders of both houses, ex-officio, and three Senators and six Representatives from each major political party, (a total of 9 Senators and 15 House members) who are elected on or before the first Wednesday of May during each regular session.

in any stage of its development, the dignity of human life is in jeopardy. The family, too, which is the very basis of our society, would be minimized or perhaps destroyed."

The aforesaid conclusion by the legislative leaders leaves no room to question, but that their real concern was the protection of fetal life.[6]

As Justice Cardozo pointed out for the Court in Helvering v. Davis, 301 U.S. 619, 644, 57 S.Ct. 904, 910, 81 L.Ed. 1307 (1937): "Our concern here as often is with power, not with wisdom." The plain issue in this case is whether or not the state has the power through its legislature to protect what it regards as human life, when such choice is supported by substantial medical, biological, and social justification. Where the state has duly enacted laws to further such purposes, such statutes bear the presumption of constitutionality. *See* United States v. Vuitch, 402 U.S. 62, 70, 91 S.Ct. 1294, 28 L.Ed.2d 601 (1971); Flemming v. Nestor, 363 U.S. 603, 617, 80 S.Ct. 1367,

4 L.Ed.2d 1435 (1960); and United States v. Weisenbloom, 168 F.2d 698, 700 (2d Cir. 1948).[7] This presumption clearly extends to the validity of the purpose underlying any legislative enactment. *See, e. g.,* Street v. New York, 394 U.S. 576, 590–591, 89 S.Ct. 1354, 22 L.Ed.2d 572 (1961).

It should be noted that the majority decision leaves the State of Connecticut with no law or control in this area of human relationships. It invites unlimited foeticide (the murder of unborn human beings), as a way of life, in a state long known as the land of steady habits. The Connecticut legislature has historically, consistently, and affirmatively expressed its determination to safeguard and respect human life. The action of the majority constitutes an unwarranted federal judicial intrusion into the legislative sphere of state government. The judiciary was never intended nor designed to perform such a function. I would uphold the constitutionality of the challenged state statutes and deny relief.

---

6. Numerous legislative attempts to repeal or modify the Connecticut anti-abortion laws have been unsuccessful. In 1967 and 1969, two such measures reached the floor of the House and were rejected. There is no doubt that the principal, if not exclusive, consideration motivating these rejections was the legislative concern with fetal life. *See, e. g.,* the floor debate on H.B.No.6584, a proposed liberalization of the Connecticut abortion laws. 1971 Proceedings, Connecticut General Assembly (House), Vol. 14, pp. 1252–1290.

7. The words of Justice Harlan, speaking for the Court, in *Flemming* are appropriate here:

"Judicial inquiries into Congressional (legislative) motives are at best a hazardous matter, and when that inquiry seeks to go behind objective manifestations it becomes a dubious affair indeed. Moreover, the presumption of constitutionality with which this enactment, like any other, comes to us forbids us lightly to choose that reading of the statute's setting which will invalidate it over that which will save it. '(I)t is not on slight implication and vague conjecture that the legislature is to be pronounced to have transcended its powers, and its acts to be considered as void.' Fletcher v. Peck, 6 Cranch 87, 128 [, 3 L.Ed. 162]." 363 U.S. at 617, 80 S.Ct. at 1376.