Janice **ABELE** et al.

v.

Arnold **MARKLE** et al.

Civ. No. B–521.

United States District Court,
D. Connecticut.

Sept. 20, 1972.

Marilyn P. A. Seichter, Hartford, Conn., Catherine G. Roraback, Ann C. Hill, Co-counsel, New Haven, Conn., Kathryn Emmett, Bridgeport, Conn., Marjorie Gelb, West Hartford, Conn., Barbara Milstein, New Haven, Conn., Nancy Stearns, New York City, for plaintiffs.

Daniel Schaefer, Asst. Atty. Gen., George D. Stoughton, Chief Asst. State's Atty., Hartford, Conn., for defendants.

Peter Tyrrell, Waterbury, Conn., and Joseph P. Nucera, Bridgeport, Conn., amicus curiae, for defendants.

Before LUMBARD, Circuit Judge, and CLARIE and NEWMAN, District Judges.

## MEMORANDUM OF DECISION

NEWMAN, District Judge:

The issue in this case is the constitutionality of Connecticut's recently enacted law prohibiting all abortions except those necessary to save the physical life of the mother.[1] Public Act No. 1, May 1972, special session. The case is an outgrowth of previous litigation before the same judges who comprise this Court. Our prior decision, rendered on April 18, 1972, declared unconstitutional §§ 53–29, 53–30, and 53–31 of the Connecticut General Statutes, statutes enacted in 1860 that had prohibited abortions subject to virtually the same exception as the present statute and had also prohibited advice and devices concerning abortions. Abele v. Markle, 342 F.Supp. 800 (D.Conn.1972). Plaintiffs in this and the earlier litigation are several hundred women including doctors, nurses, social workers and others who wish to advise concerning abortions, and pregnant women who wish to have an abortion. Defendants in both cases are the state attorney general and the state's attorneys, the latter having jurisdiction to prosecute for violations of the challenged statute.

1. "Section 1. The public policy of the state and the intent of the legislature is to protect and preserve human life from the moment of conception and in order to effectuate this public policy and intent:
"(a) No person shall give or administer to any female person, advise or cause her to take or use anything, or use any means, with intent to procure upon her a miscarriage or abortion, nor shall any female person do or suffer anything to be done, with intent thereby to produce upon herself a miscarriage or abortion.
"(b) No person shall sell or advertise medicines or instruments or other devices for the commission of a miscarriage or abortion, except to a licensed physician or a hospital licensed by the state of Connecticut.
"(c) The provisions of subsections (a) and (b) of this section shall not apply to an abortion or miscarriage performed by a licensed physician when such abortion or miscarriage is necessary to preserve the physical life of the mother and when such abortion is performed in a hospital licensed by the state of Connecticut.
"(d) A violation of this section shall be a Class D felony.
"Sec. 2. If any part of this act shall be held invalid, such holding shall not affect the validity of the remaining parts of this act. If a part of this act is invalid in one or more of its applications, the remaining parts of this act shall remain in effect in all valid applications that are severable from the invalid applications.
"Sec. 3. This act shall take effect from its passage."

■ After our earlier decision, the Connecticut General Assembly met in a special session and on May 23, 1972, enacted Public Act No. 1. Thereafter plaintiffs filed in the prior case a motion to enjoin the enforcement of the new statute.[2] On May 31, 1972, the Chief Judge of this Circuit designated the three judges who had heard the prior case to be members of a new three-judge district court, pursuant to 28 U.S.C. § 2284, to hear the constitutional challenge to the new statute. Believing that this challenge should be heard in a separate case, we ordered that the motion papers be considered a complaint and filed with a new case number.[3] A hearing was subsequently held at which both sides presented witnesses. In addition various documents and photographs have also been presented and considered, and we have had the benefit of helpful briefs by amici curiae supporting both sides.

■ The substantive provisions of the 1972 legislation prohibiting abor-

tions are quite similar to the 1860 statutes. However, the 1860 exception which had permitted an abortion when necessary to preserve the life of the woman or that of the unborn child has been limited in the new statute to an abortion "necessary to preserve the physical life of the mother." The maximum penalties which had been two years for the woman, five years for performing an abortion, and one year for encouraging an abortion have all been set at five years. More significantly, while the former statutes made no explicit reference to the state interest they were purporting to advance, the first section of the 1972 legislation reads as follows:

"The public policy of the state and the intent of the legislature is to protect and preserve human life from the moment of conception . . . ."[4]

Thus the Connecticut General Assembly has expressed its judgment, in the text of the challenged statute, that the life of a fetus should be protected.[5] That spec-

---

2. The motion also sought the issuance of an order requiring the Governor to show cause why he should not be held in contempt for his role in urging passage of the new legislation. Being unanimously of the view that the request for such an order was frivolous, we denied it from the bench.

3. Defendants have objected to the case proceeding in this fashion, pointing out that a new summons was never issued upon the new "complaint." See Fed.R.Civ.P. 4(a). We fail to see how any rights of the defendants have in any way been prejudiced. The new papers were all served upon defendants' counsel, and defendants have had full and fair notice of the claims being made and a full opportunity to be heard. The formal requirement for personal service of a summons and complaint upon defendants alerts them to the possibility that default will enter for failure to respond, a prospect of no applicability to this case.

Plaintiffs subsequently filed in the new case a substituted complaint, which was served upon defendants' counsel.

4. For the author of this opinion, this statement of legislative purpose makes the issue posed by plaintiffs' challenge to Connecticut's new abortion statute quite dif-

ferent from the issue raised by the challenge to the prior statutes. From my review of the relevant materials I concluded that the state interest sought to be advanced by the prior statutes was protection of the mother's health. However the situation might have been in 1860, that interest could not possibly justify invasion of the mother's right to privacy in 1972 when the undisputed medical facts established that abortion poses a lesser health risk to the mother than does childbirth. Since the state interest being advanced was factually unsound, it plainly could not be used to justify an abridgement of the mother's constitutional rights. 342 F.Supp. at 805–811. The state interest now specified, however, is not factually unsound. A statute of this sort, as I previously indicated, 342 F.Supp. at 810 and 811 n. 18, poses a far more difficult question, one that I did not believe should be decided unless such a statute was enacted.

5. While plaintiffs contend that the state does not consistently protect the life of the fetus throughout its statutes, any such inconsistency does not impair the power of the state to protect the interest which this statute purports to protect. In the absence of equal protection claims,

ification of legislative purpose raises the constitutional question of whether the state has power to advance such a purpose by abridging almost totally the constitutionally protected right of a woman to privacy and personal choice in matters of sex and family life.

█ The existence of a woman's constitutional right to such privacy has been set forth by the Supreme Court. Eisenstadt v. Baird, 405 U.S. 438, 92 S. Ct. 1029, 31 L.Ed.2d 349 (1972); Griswold v. Connecticut, 381 U.S. 479, 85 S. Ct. 1678, 14 L.Ed.2d 510 (1965). Indeed, *Baird* may have anticipated the outcome of cases such as this when the Court observed:

> "If the right of privacy means anything, it is the right of the *individual*, married or single, to be free from unwarranted governmental intrusion into matters so fundamentally affecting a person as the decision whether to *bear* or beget a child." 405 U.S. at 453, 92 S.Ct. at 1038 (second emphasis added).

In any event, the woman's right exists, and there is no question that the statute here challenged is a direct abridgement of her right. It is not a regulation of the manner in which abortions may be performed, such as in appropriate medical facilities or by appropriate medical personnel. It is an absolute prohibition. And the prohibition applies to every case of a pregnant woman with the sole exception of an abortion necessary to preserve the woman's life.

*Griswold* illustrates two approaches to the constitutional issue posed by this case. The opinion of Justice Douglas appears to posit the right of marital privacy as an absolute right, totally immune from state abridgement. The opinions of Justices Harlan, White and Goldberg, however, all concede that the right may be abridged if the state can demonstrate that its regulation is founded upon a sufficiently compelling state interest.

It may well be that the right of a woman to decide whether or not to carry to term the fetus within her is a right immune from total governmental abridgement. Certainly the interests of a woman in giving of her physical and emotional self during pregnancy and the interests that will be affected throughout her life by the birth and raising of a child are of a far greater degree of significance and personal intimacy than the right to send a child to private school protected in Pierce v. Society of Sisters, 268 U.S. 510, 45 S.Ct. 571, 69 L.Ed. 1070 (1925), or the right to teach a foreign language protected in Meyer v. Nebraska, 262 U.S. 390, 43 S.Ct. 625, 67 L.Ed. 1042 (1923). The Supreme Court has observed that the *Meyer* and *Pierce* decisions "have respected the private realm of family life which the state *cannot enter.*" Prince v. Massachusetts, 321 U.S. 158, 166, 64 S.Ct. 438, 442, 88 L.Ed. 645 (1944) (emphasis added). The right to an abortion is of even greater concern to the woman than the right to use a contraceptive protected in Griswold v. Connecticut, *supra*, for contraception is not the only means of preventing pregnancy, whereas abortion is the only means of terminating an unwanted pregnancy. The significance of the woman's right might be discounted somewhat if she simply changed her mind after a deliberate decision to become pregnant. But the significance of the right is extremely high if pregnancy results because the woman is ignorant, or because through no fault of her own a contraceptive device has failed, and the significance is at the utmost when pregnancy results because the woman has been raped. The statute before us abridges the woman's right in all of these situations.

However, since most members of the majority in *Griswold* sought to apply the compelling state interest test, we are

---

a state has power to promote a state interest even though other statutes fail to promote the same interest as much or at all.

obliged to do the same.[6] Normally that would require making the difficult judgment as to whether the state interest asserted is sufficiently compelling to justify abridgement of the woman's constitutional right. But there are two distinguishing aspects of this case that require consideration before the state interest can be weighed against the woman's right. The first concerns the nature of the rights possessed by the fetus for whose benefit the state interest is asserted. The second concerns the nature of the state interest being asserted.

A. The initial inquiry is whether the fetus is a person, within the meaning of the fourteenth amendment, having a constitutionally protected right to life. If it is, then a legislature may well have some discretion to protect that right even at the expense of someone else's constitutional right. But if the fetus lacks constitutional rights, the question then becomes whether a legislature may accord a purely statutory right at the expense of another person's constitutional right.

■ Our conclusion, based on the text and history of the Constitution and on cases interpreting it, is that a fetus is not a person within the meaning of the fourteenth amendment. There is nothing in the history of that amendment nor in its interpretation by the Supreme Court to give any support whatever to the contention that a fetus has constitutional rights. In United States v. Vuitch, 402 U.S. 62, 91 S.Ct. 1294, 28 L. Ed.2d 601 (1971), the Supreme Court answered a void-for-vagueness attack upon a District of Columbia abortion statute by construing the statute to permit abortions to protect not only the mother's life and physical health but her mental health as well. If a fetus was a person with a fourteenth amendment right not to be deprived of life except by due process of law, it is inconceivable that the Court would have resolved a doubtful question of statutory construction by enlarging the situations in which such a life could be extinguished. Moreover, while *Vuitch* did not rule on either the constitutional right of the fetus or the constitutional right of the woman, the decision casts not the slightest doubt on the validity of a statute permitting an abortion to protect a woman's mental health. Surely the Court would have withheld even tacit approval of abortions in such circumstances if the consequence was the termination of a life entitled to fourteenth amendment protection.

No decision has come to our attention holding that a fetus has fourteenth amendment rights. The issue was squarely faced by at least two of the courts that have sustained the constitutionality of state laws permitting abortions. Byrn v. New York City Health & Hospitals Corp., 31 N.Y.2d 194, 335 N. Y.S.2d 390, 286 N.E.2d 887 (1972); McGarvey v. Magee-Woman's Hospital, 340 F.Supp. 751 (W.D.Pa.1971). Cf. Poe v. Menghini, 339 F.Supp. 986 (D. Kan.1972). *Byrn* and *McGarvey* reject the claim that a fetus has fourteenth amendment rights.[7] Indeed, it is diffi-

6. The compelling state interest test has normally been explicitly applied in two situations. The first is where a regulation touching upon a fundamental interest or based on a suspect criterion is challenged on equal protection grounds. See, e. g., Shapiro v. Thompson, 394 U.S. 618, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969); Loving v. Virginia, 388 U.S. 1, 87 S.Ct. 1817, 18 L.Ed.2d 1010 (1967). The second is where a regulation impairs the exercise of a constitutional right rather than prohibits its exercise. See, e. g., N.A.A.C.P. v. Alabama, 357 U.S. 449, 78 S.Ct. 1163, 2 L.Ed.2d 1488 (1958);

Sherbert v. Verner, 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963). See Branzburg v. Hayes, 408 U.S. 665, at n. 18, 92 S.Ct. 2646, 33 L.Ed.2d 626 (1972). This case, like *Griswold*, fits neither pattern. The assertion of a constitutional right to marital privacy stands independent of any equal protection claim, and the exercise of that right is directly prohibited by Public Act No. 1, rather than merely impaired.

7. See also Doe v. Bolton, 319 F.Supp. 1048, 1055 (N.D.Ga.1970), prob. juris. postponed to hearing on the merits, 402

cult to imagine how a statute permitting abortion could be constitutional if the fetus had fourteenth amendment rights. Even one of the few decisions sustaining the constitutionality of a restrictive abortion statute casts no doubt on the propriety of a legislative judgment permitting abortion where there is substantial risk that the mother's health would be gravely impaired or where pregnancy resulted from rape or incest. Corkey v. Edwards, 322 F.Supp. 1248 (W.D.N.C. 1971). We do not believe such circumstances could justify terminating the life of a person with fourteenth amendment rights.[8]

If the fetus survives the period of gestation, it will be born and then become a person entitled to the legal protections of the Constitution. But its capacity to become such a person does not mean that during gestation it is such a person. The unfertilized ovum also has the capacity to become a living human being, but the Constitution does not endow it with rights which the state may protect by interfering with the individual's choice of whether the ovum will be fertilized. Griswold v. Connecticut, *supra.*

Of course, the fact that a fetus is not a person entitled to fourteenth amendment rights does not mean that government may not confer rights upon it. A wide range of rights has been accorded by statutes and court decisions. These include the right to compensation for tortious injury, the right to parental support, and the right to inherit property. But the granting of these rights was not done at the expense of the constitutional rights of others. A tortfeasor has no constitutional right to inflict injury on a fetus. When government acts through legislation to confer upon a fetus the absolute right to be born contrary to the preference of a pregnant woman, it abridges her constitutional right to marital and sexual privacy. Whether it may do so cannot be established by the fact that other protections can be accorded which do not abridge another's constitutional rights.

It is one thing to permit a legislature some discretion in adjusting conflicting rights between groups of people, each of whom has a claim to constitutional protection. See, e.g., Katzenbach v. McClung, 379 U.S. 294, 85 S.Ct. 377, 13 L. Ed.2d 290 (1964); Jones v. Alfred H.

U.S. 941, 91 S.Ct. 1614, 29 L.Ed.2d 109 (1971).

While *Byrn* and *McGarvey* also expressed the view that the extent of protection to be accorded a fetus was appropriately a matter of legislative concern, we think this aspect of those decisions failed to give adequate recognition to the significance of the woman's constitutional right or to the variety of personal judgments concerning the state interest advanced to abridge her right, which renders the state interest insufficient to justify the almost total abridgement of the woman's right accomplished by the statute here challenged. See part B of text, *infra.*

8. The brief of the amicus curiae Planned Parenthood Federation of America, Inc., suggests two other reasons to doubt the existence of fourteenth amendment rights in a fetus. They point out that the fourteenth amendment provides for the apportionment of members of the House of Representatives based on the whole number of "persons" counted in each state,

and that fetuses have never been counted for this purpose. The argument is of interest but not determinative, since corporations are also not counted for apportionment purposes, yet are persons at least for some fourteenth amendment rights. Grosjean v. American Press Co., 297 U.S. 233, 244, 56 S.Ct. 444, 80 L.Ed. 660, (1936); cf. Hague v. C. I. O., 307 U.S. 496, 527, 59 S.Ct. 954, 83 L.Ed. 1423 (1939); see D.D.B. Realty Corp. v. Merrill, 232 F.Supp. 629, 637 (D.Vt.1964). They also rely on Montana v. Rogers, 278 F.2d 68 (7th Cir. 1960), aff'd sub nom. Montana v. Kennedy, 366 U.S. 308, 81 S.Ct. 1336, 6 L.Ed.2d 313 (1961), which held that a person born abroad does not acquire United States citizenship under the fourteenth amendment because as a fetus he was in this country during his mother's pregnancy. That decision involved the clause of the amendment which confers citizenship on all persons *born* or naturalized in the United States; the fetus was plainly not born in the United States whether or not it was deemed a person while here.

Mayer Co., 392 U.S. 409, 88 S.Ct. 2186, 20 L.Ed.2d 1189 (1968). It is altogether different to suggest that a legislature can accord a statutory right to a fetus which lacks constitutional rights when doing so requires the abridgement of a woman's own constitutional right. No doubt a right to be born is of greater significance than the right to receive compensation for tortious injury or other pecuniary or property rights. But it is doubtful whether the constitutional right of the mother can be totally abridged by a legislative effort to confer even a significant statutory right upon a fetus which does not have any fourteenth amendment rights.

B. The state interest advanced by this statute is critically different in nature than state interests that have been claimed, in other cases, to be sufficiently compelling to justify impairment of constitutional rights. A compelling state interest has generally been one where the nature of the interest was broadly accepted, with dispute remaining only as to whether the state could constitutionally advance that interest by the specific means being challenged. When Americans of Japanese descent were placed in relocation camps as a protection in the event of invasion, it was widely accepted that there was an important governmental interest in military security, even though it was a matter of sharp dispute whether that interest could justify an abridgement of constitutional rights based on a racial classification. Korematsu v. United States, 323 U.S. 214, 65 S.Ct. 193, 89 L.Ed. 194 (1944). Even where a governmental interest has been found not sufficiently compelling, there is usually no dispute about the nature of the state interest. For example, in N.A.A.C.P. v. Alabama, 357 U.S. 449, 78 S.Ct. 1163, 2 L.Ed.2d 1488 (1958), the state of Alabama had a generally accepted interest in the enforcement of its corporate laws; the constitutional issue was whether that acknowledged interest was sufficient to justify disclosure of N.A.A.C.P. membership lists, an impairment of first amendment rights.

In this case the constitutional issue would be difficult enough if it involved determining whether the woman's right to privacy is outweighed by the state interest in protecting the life of the fetus. But here there is serious dispute concerning the nature of the state interest to be weighed. Some believe the fetus is in every respect a human being from the moment of conception. Others believe there is a point during the pregnancy when it becomes in many respects a human being. Still others believe that until it is born, a fetus is merely a mass of protoplasm, which, though it may have some attributes of a human being such as hunger and a nervous system, is not a human being in any sense.[9] No decision of the Supreme Court has ever permitted anyone's constitutional right to be directly abridged to protect a state interest which is subject to such a variety of personal judgments. Whatever discretion a legislature may have in deciding, within constitutional limits, to assert a generally acknowledged state interest at the expense of a constitutional right, it cannot do so here where the significance of the constitutional right is extraordinarily high, and the nature of the state interest asserted is itself a matter of such diverse personal judgment. Such an interest cannot acquire

9. The range of views on this subject can be found not only in the fields of philosophy and religion. There is in the record in this litigation substantial evidence of the variety of views held by highly regarded members of the medical profession. Plaintiffs have submitted a statement by 100 professors of obstetrics and gynecology, from nearly all the leading medical schools in the country, 112 American Journal of Obstetrics and Gynecology 992–98, April 1, 1972, a policy statement adopted by the executive board of the American College of Obstetricians and Gynecologists in August 1970, and a resolution adopted by the House of Delegates of the American Medical Women's Ass'n, Inc., on November 7, 1969, all supporting the woman's right to an abortion. Defendants have responded with affidavits from 39 doctors, all, in varying degrees, expressing an opposing view.

the force of a governmental decree to abridge an individual's constitutional right. To uphold such a statute would permit the state to impose its view of the nature of a fetus upon those who have the constitutional right to base an important decision in their personal lives upon a different view.

No doubt in the opinion of many people the nature of a fetus as a human being is a matter of absolute moral certainty. In their view, perhaps in the view of some of the legislators who enacted this statute, abortion is considered the deliberate killing of a human being. We do not doubt the sincerity of those who hold this view, nor minimize the depth of their conviction in this regard. But under the Constitution, their judgment must remain a personal judgment, one that they may follow in their personal lives and seek to persuade others to follow, but a judgment they may not impose upon others by force of law.

■ There are those who believe it is destructive of patriotism to permit individual school children to decline to pledge allegiance to the flag because of their personal religious views. There are those who believe it is destructive of religion to bar public school authorities from conducting religious exercises in schools. There are those who believe it is destructive of family life to permit the use of contraceptives. In each instance, the viewpoint behind the challenged governmental action was a serious, thoughtful judgment, deeply held by large numbers of people. But in each instance the Supreme Court ruled that such a viewpoint could not constitutionally be imposed by the power of the state upon individuals who did not share this view. West Virginia State Board of Educ. v. Barnette, 319 U.S. 624, 63 S.Ct. 1178, 87 L.Ed. 1628 (1943); Engel v. Vitale, 370 U.S. 421, 82 S.Ct. 1261, 8 L.Ed.2d 601 (1962); Griswold v. Connecticut, *supra.* The premise of these decisions, and of the Bill of Rights itself, is that in the long run, patriotism, religion, and family life will flourish better in an environment of individual freedom if state regimentation of thought is prohibited. The same premise leads to the conclusion that a woman's right to decide whether to have an abortion cannot be completely abridged by a state statute imposing upon her the uniformity of thought about the nature of a fetus which is reflected in Public Act No. 1.

Thus, the compelling state interest test cannot be applied in this case in the same way it has been applied in other cases. The fetus, for whose benefit the state interest is asserted, does not have constitutional rights. Moreover, the state interest being asserted is subject to widely varying personal views. Of course, legislation is not rendered unconstitutional simply because it advances a social policy about which people differ. Normally it is the legislative function to resolve such differences. But where a state interest subject to such variety of viewpoint is asserted on behalf of a fetus which lacks constitutional rights, and where the assertion of such an interest would accomplish the virtually total abridgement of a constitutional right of special significance, in these circumstances such a state interest cannot prevail.

■ The state earnestly urges upon us consideration of the situation where an abortion performed late in a pregnancy results in a "live birth." Evidence was offered to show that an aborted fetus had on occasion remained alive for several hours after an abortion operation. It is not entirely clear which of two alternative contentions the state is making: (a) that the state has a compelling interest in protecting the life of a fetus which actually survives an abortion operation; or (b) that the state has a compelling interest in protecting the life of a fetus *in utero* which has progressed to the point during pregnancy when it could survive outside the uterus. Of course, neither contention justifies Public Act No. 1, because the abridgement of the woman's constitu-

tional right accomplished by this statute is far more extensive than what would be required to protect the life of a fetus in either of the situations just described. A statute may not advance a governmental interest at the expense of a fundamental constitutional right if that interest may be advanced by a less drastic abridgement. See, e.g., United States v. Robel, 389 U.S. 258, 88 S.Ct. 419, 19 L.Ed.2d 508 (1967). And while we need not and should not express any conclusion about statutes advancing such more limited interests, analysis of them does serve to highlight the invalidity of the statute before us.

■ If a statute protected the lives of all fetuses born alive, it would be protecting persons entitled to fourteenth amendment rights. And while there may be some variation in viewpoint, it would be generally accepted that the right to life of a live baby, born through survival of an abortion performed late in pregnancy, is an interest the state may protect. Moreover, a statute protecting the life of such a surviving fetus would not impair the woman's right to an abortion. The woman has had the abortion; it simply has not been successful.

If a statute sought to protect the lives of all fetuses which could survive outside the uterus, such a statute would be a legislative acceptance of the concept of viability. While authorities may differ on the precise time, there is no doubt that at some point during pregnancy a fetus is capable, with proper medical attention, of surviving outside the uterus. And it is equally clear that there is a minimum point before which survival outside the uterus is not possible.[10] A statute designed to prevent the destruction of fetuses after viability has been

reached would be subject to these considerations. Like the present statute, it would be conferring statutory rights on a fetus which does not have constitutional rights. However, the state interest in protecting the life of a fetus capable of living outside the uterus could be shown to be more generally accepted and, therefore, of more weight in the constitutional sense than the interest in preventing the abortion of a fetus that is not viable. The issue might well turn on whether the time period selected could be shown to permit survival of the fetus in a generally accepted sense, rather than for the brief span of hours and under the abnormal conditions illustrated by some of the state's evidence. As to the latter situations, the nature of the state interest might well not be generally accepted. Finally, and most important, such a statute would not be a direct abridgement of the woman's constitutional right, but at most a limitation on the time when her right could be exercised. The present statute, however, does not present any of the considerations favorable to the state that might be found in either type of statute of more limited scope.

■ For these reasons, we hold, as have most courts that have considered similar statutes,[11] that plaintiffs are entitled to a judgment declaring Public Act No. 1 unconstitutional. Such a judgment does not limit the power of the state to enact reasonable regulations specifying the facilities where abortions may be performed or the personnel qualified to perform them. For the reasons set forth in the prior litigation, 342 F. Supp. at 812, we also hold that plaintiffs are entitled to an injunction prohibiting enforcement of Public Act No. 1.[12]

10. While we need not make any finding on this point, we note that the affidavit of Dr. Virginia M. Stuermer, of New Haven, sets forth what appears to be a medical consensus that the fetus normally becomes viable approximately 28 weeks after conception.

11. The cases are collected in the prior decision in this litigation, 342 F.Supp. at 803 n. 14.

12. The injunction will also make it certain that jurisdiction to consider an appeal taken by defendants from our judgment lies directly with the Supreme Court. 28 U.S.C. § 1253.

CLARIE, District Judge (dissenting):

My earlier dissenting opinion in Abele v. Markle, 342 F.Supp. 800, 812 (D. Conn.1972) concluded that the Legislature, not the Judiciary, was designed by our founding fathers to reflect the standards of human decency which must be weighed in any choice between the competing moral values which are to guide governmental policy. By reenacting legislation which declared the paramountcy of the human fetus' right to life over a woman's right to privacy, except where it could be demonstrated that the mother's life would be jeopardized, the Connecticut Legislature *reaffirmed* that basic choice.

Separate opinions of the majority declaring the prior statute unconstitutional disclosed conflicting judicial points of view. Judge Lumbard found that the 1860 statute was designed to protect the life of the unborn child, but considered the statute's purpose to be constitutionally insufficient. Judge Newman, on the other hand, found that the protection of the health of the mother was the primary legislative objective and that such purpose was not sufficient to justify a legislative invasion of the mother's constitutional right to privacy. Judge Newman further emphasized at page 810,

"If the Connecticut legislature had made a judgment on this issue and had enacted laws to accord such protection to the unborn child, the constitutionality of such laws would pose a legal question of extreme difficulty, since the legislative judgment on this subject would be entitled to careful consideration."

In response to the majority's decision, a Special Session of the Connecticut Legislature was called by the Governor to enact a new statute to fill the void. Public Act No. 1 was adopted by that Special Session and is the law which the plaintiffs are presently challenging. The preamble of that Act forthrightly declares the statute's purpose:

"Section 1: The public policy of the State and the intent of the Legislature is to protect and preserve human life from the moment of conception . . . ."

The single exception to that protection, is the existence of circumstances wherein an abortion is required to preserve the physical life of the mother.

The dissenting opinion in Abele v. Markle, *supra,* is strengthened by the recent opinion of the New York Court of Appeals in Byrn v. New York City Health & Hosp. Corp., 31 N.Y.2d 194, 335 N.Y.S.2d 390, 286 N.E.2d 887 (1972), wherein the constitutionality of the New York State Abortion Law allowing abortions was challenged. The Court said:

"There are, then, real issues in this litigation, but they are not legal or justiciable. They are issues outside the law unless the Legislature should provide otherwise. The Constitution does not confer or require legal personality for the unborn; *the Legislature may,* or it may do something less, as it does in limited abortion statutes, and provide some protection far short of conferring legal personality." (emphasis added).

The concurring opinion further reinforces this observation, when it added:

"As Judge Breitel's opinion recognizes, the formidable task of resolving this issue is not for the courts. Rather, the extent to which fetal life should be protected 'is a value judgment not committed to the discretion of judges but reposing instead in the representative branch of government.' . . . . Since the Constitution does not prohibit the determination made by the Legislature and there is a reasonable basis for it, the validity of the statute should be sustained."

The majority lightly brushes aside the time honored separation of powers and judicially declares *ipse dixit* that an unborn human fetus is not a person and has no constitutional rights requiring

234

recognition. Such a sweeping statement would include, of course, unborn viable babies, who are physically able to exist outside the mother's body. Thus, an unborn full term baby could be killed with impunity in its mother's womb if we were to accept the conclusion that the human fetus has no rights until birth.

Citing no authoritative decision, the majority appears to rest its position entirely upon the fourteenth amendment and United States v. Vuitch, 402 U.S. 62, 91 S.Ct. 1294, 28 L.Ed.2d 61 (1970). Clause 1, § 1 of the fourteenth amendment provides:

"All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside."

The majority states that "[i]f the fetus survives the period of gestation, it will be born and then become a person entitled to the legal protections of the Constitution," thereby construing birth to be a prerequisite to personage. This construction is compelled neither by logic nor the text of the amendment, for by its terms birth is a precondition only to citizenship. The fallacy of the majority's construction is accentuated by the fact that corporations have long been considered "persons" within the meaning of the fourteenth amendment despite the fact that they are not born. Santa Clara County v. Southern Pac. R.R. Co., 118 U.S. 394, 396, 6 S.Ct. 1132, 30 L.Ed. 118 (1885); Hague v. C. I. O., 307 U.S. 496, 527, 59 S.Ct. 954, 83 L.Ed. 1423 (1938); Merced Dredging Co. v. Merced County, 67 F.Supp. 598, 604 (S.D.Calif. 1946).

Imperfect though the comparison may be, the analogy between a corporate "person" and a person at a fetal stage of development is of value since it leads to the conclusion that creation, rather than birth, defines the juncture at which a person comes into being. The fact that distinctions have been drawn between "artificial" and "natural" persons does not diminish the analogy's force, since neither the nature of a fetus nor the manner in which it is created may be deemed artificial. This conclusion is further buttressed by the eloquence of the Declaration of Independence: "We hold these truths to be self-evident, that all men are *created* equal . . . ." (emphasis added).

The second premise upon which the majority concludes that fetal life is not constitutionally protected is United States v. Vuitch, *supra*. The issue there, it must be borne in mind, was whether or not the District of Columbia Abortion Law was unconstitutionally vague, not whether fetal life should be constitutionally protected. McGarvey v. Magee-Womens Hospital, 340 F.Supp. 751, 753 (W.D.Pa.1971). Thus, *Vuitch* should not be viewed as a *sub silentio* constitutional adjudication, but rather a deliberate choice by the Court not to comment on fetal life in constitutional terms.

Since Eisenstadt v. Baird, 405 U.S. 438, 92 S.Ct. 1029, 31 L.Ed.2d 349 (1972) and Griswold v. Connecticut, 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965) dealt with state regulation of the distribution and use of contraceptive devices, their focus was upon the choice as to the begetting of new life and not upon the destruction of life already begotten. Hence, neither case is authority for the proposition that fetal rights *unwarrantedly* infringe upon a mother's constitutional rights. The law recognizes few absolutes:

"[t]he family itself is not beyond regulation in the public interest . . . . And neither rights of religion nor rights of parenthood are beyond limitation. Acting to guard the general interest in youth's well being, the state as *parens patriae* may restrict the parent's control by requiring school attendance, regulating or prohibiting the child's labor, and in many other ways. Its authority is not nullified merely because the parent grounds his claim to control the child's course of conduct on religion or conscience. . . . The right to

practice religion freely does not include liberty to expose the community or the child to communicable disease or the latter to ill health or death." Prince v. Massachusetts, 321 U.S. 158, 166–167, 64 S.Ct. 438, 442, 88 L.Ed. 645 (1943).

If the perimeters of first amendment freedoms may be shaped by the values of society, it follows that the penumbras emanating from other provisions of the Bill of Rights must be equally malleable. That such rights may be circumscribed by statute is unquestionable. See e. g. Braunfeld v. Brown, 366 U.S. 599, 81 S. Ct. 1144, 6 L.Ed.2d 563 (1961), Chaplinsky v. New Hampshire, 315 U.S. 568, 62 S.Ct. 766, 86 L.Ed. 1031 (1942). And that the beneficiary of such statutory protection need not itself possess constitutional rights appears established. United States v. O'Brien, 391 U.S. 367, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968).

The only real consideration is whether the state possesses an interest sufficiently compelling to justify an interference with a woman's constitutional right. This, it is submitted, is the sole justiciable issue presented.

In the majority's view, "the compelling state interest test cannot be applied in this case in the same way it has been applied in other cases" since the state interest is "subject to such variety of viewpoint." Accordingly, it is claimed that a state interest is sufficiently compelling only when it is "broadly accepted" and it is broadly accepted only in the absence of "diverse personal judgments." The fallacy of this analysis is that diversity of viewpoint does not diminish state interest but often intensifies it. It is precisely for this reason that the weighing of conflicting values and viewpoints is a legislative, not a judicial, task.

"In a democratic society legislatures, not courts, are constituted to respond to the will and consequently the moral values of the people." Furman v. Georgia, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (Burger, C. J. dissenting). "We

should not allow our personal preferences as to the wisdom of legislative and congressional action . . . to guide our judicial decision." Id. at 411, 92 S. Ct. at 2815 (Blackmun, J., dissenting). That the majority has taken unto itself the legislative task of measuring degrees of public acceptance is evident in its pronouncement that "the state interest in protecting the life of a fetus capable of living outside the uterus could be shown to be more generally accepted and, therefore, of more weight. . . ."

The constitutional structure of our democracy demands judicial restraint where the choice of human values embodied by a legislative act does not unwarrantedly invade constitutionally protected rights. The Connecticut Legislature has weighed these factual considerations on society's scale of standards of decency.

The Legislature was undoubtedly aware that biologists, fetologists, and medical science commonly accept conception as the beginning of human life and the formation of an individual endowed with its own unique genetic pattern (Tr. 205); that the heart functions and circulates blood through the human fetus at three to five weeks (Tr. 286) and that blood groupings may be ascertained at eight weeks (Tr. 206); that while nutrients are fed to the baby from the mother through the placenta and the waste similarly excreted, the placenta is really part of the baby. (Tr. 284); and that the latter's heart pumps its own blood through the umbilical vessels and lives as a separate entity suspended in amniotic fluid. (Tr. 210).

They had available to them medical information that, as early as seven weeks, brain waves are detectible in the unborn child and that it is known to react to drugs (Tr. 212); that physical reflexes such as contraction of the limbs, movements of the mouth, the eyelids, and general contraction of the body have been elicited from the maturing infant as early as six weeks; and that unborn

babies weighing as little as 395 grams (13 ounces) have been known to survive outside the mother (Tr. 295–296). They were also aware that medical research in the field of fetal medicine is a comparatively new branch of medicine (Tr. 252) and that the transplantation of life to artificial placentas is presently being studied.

Similarly available to the Connecticut Legislature were the abortion experience statistics of New York City under that State's statute which allowed abortion upon request.[1] During the twelve-month period from July 1, 1970, through June 30, 1971, in that one city alone, there were officially recorded 139,042 induced abortions[2]; and for the six-month period from July 1, 1971, through December 31, 1971, there were 111,590.[3] If these latter statistics were to be projected on a national population scale, the total number would amount to several million induced deaths of innocent victims annually. It is a legislative choice of societal values, which must decide a public policy of such magnitude, for that choice of values could either demean human life or enoble mankind's destiny.

All of these considerations were undoubtedly pondered by the Legislature before the determination was made that human life should not be compromised in the name of personal comfort or convenience. It is nothing less than judicial usurpation of a legislative prerogative to decide that at one point in fetal development, through an obscure process of legal metamorphosis (in this case, the degree and quality of "public acceptance") the state may constitutionally protect fetal life, but that prior to such point in time, the state may not protect what it also regards, with substantial popular and medical justification, as human life.

It is for these reasons, and for those expressed in my earlier opinion in Abele v. Markle, *supra,* that I respectfully dissent.

---

1. By a vote of 79 to 68 in the Assembly on May 10, 1972, and 30 to 27 in the Senate the following day, the New York State Legislature voted to repeal this statute. Its action, however, was vetoed by the Governor of New York.

2. New York City Department of Health, Bulletin on Abortion Program, End of First Year Report, at 1 (June 1971).

3. New York City Department of Health, Bulletin on Abortion Program, at 1 (May 1972).